N. B. DREW, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16418, 16419. Promulgated January 10, 1949.

6

*Wilson S. Wiley, Esq.*, and *Rollin P. Rodolph, C. P. A.*, for the petitioner.

*Robert G. Harless, Esq.*, for the respondent.

10

OPINION.

JOHNSON, *Judge*: Under the view that no partnership between petitioner and his wife should be recognized for tax purposes, respondent determined petitioner taxable on all the profits from Drew's Manstore in 1944 and 1945, but reduced such profits by $5,547.82 and $10,627.88, respectively, described as deductions "for salary to your wife and interest on her investment in the business." The amounts of these deductions equal 30 per cent of profits computed without them. From this method of computation it is obvious that the deductions do not represent determinations of reasonable compensation for services rendered and capital used, but merely a reallocation of business profits on a 70–30 per cent basis instead of the 50–50 per cent basis fixed by the parties' instrument of January 23, 1943. Regardless of his recognition that the wife had invested capital in the business and had rendered valuable services to it, respondent now defends the determinations by the argument that the wife had not made any capital contribution and that her services are not shown by petitioner to have been vital or substantial. He urges further that prior to 1943 petitioner and she had not purported to own the business jointly or to be partners, and he challenges the sufficiency of the instrument of January 23, 1943, as a "foundation upon which to lay a claim of partnership."

We agree in principle that no partnership is recognizable in the absence of an intent to form one; cf. *L. C. Olinger*, 10 T. C. 423, and cases therein cited. But as petitioner does not contend that a partnership existed prior to 1943 and as the years here involved are 1944 and 1945, we perceive no occasion for deciding the question suggested. The instrument of January 23, 1943, however, leaves no doubt about intent. Petitioner thereby purported to convey to his wife "an undivided one-half interest in and to the business," and it was specified that profits and losses should be shared equally. Thereafter, as before, business receipts were deposited in a joint bank account against which each could draw, and for 1943 and later years partnership income tax returns were filed. While the words "partner" and "partnership" are not used in the instrument, this omission lacks decisive significance, for, as said by the Supreme Court in *Commissioner* v. *Tower*, 327 U. S. 280:

> * * * A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession or business and when there is community of interest in the profits and losses. * * * whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both * * * is a question of fact * * *

For tax purposes, moreover, the meaning of "partnership" is expanded by section 3797 (2), Internal Revenue Code, to include "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on."

The evidence indicates clearly that at the time of marriage in 1914 the wife had some separate funds; that she was gainfully employed after marriage; and that about half of the $2,500 invested in the dry cleaning business, with which petitioner began at Klamath Falls, originated with her. Respondent argues technically that this contribution is of no bearing on the issue, for the dry cleaning business was sold by 1930, and the clothing business, a distinct enterprise, was initially financed by a $2,000 loan. This loan, however, was procured on a note which both signed, and, as no outside capital has ever been used, it was presumably paid from business operating profits which were deposited in a joint bank account. For recognition that the wife made a capital contribution to the business, it is not necessary to find that the amount was large or that it can be traced through business transactions and changes over the years. *Graber* v. *Commissioner* (C. C. A., 10th Cir.), 171 Fed. (2d) 32; *Weizer* v. *Commissioner* (C. C. A., 6th Cir.), 165 Fed. (2d) 772; *Wilson* v. *Commissioner* (C. C. A., 7th Cir.), 161 Fed. (2d) 661. It is enough that the wife's contribution was a material factor in the establishment and operation of the enterprise. Drew's Manstore was developed from

small beginnings. It grew from the joint efforts of petitioner and his wife in the use of a joint loan and jointly held funds derived from operation of the dry cleaning business which had been launched less than a year before with the $2,500, of which the wife had contributed about half. Under such circumstances it is immaterial that the precise part of the clothing business and its earnings of later years attributable to the wife's capital is not susceptible of proof, for it is clear that about half of the capital ever used by petitioner originated with her. Such evidence warrants the conclusion that she did make a contribution, and we have so found.

The evidence is equally persuasive that she contributed vital services and participated in management. Respondent attempts to minimize the nature and extent of the services, alleging that the testimony about them is vague and that the "home training of a splendid family of four boys" would not have left her sufficient time for any substantial work at the store. However she managed it, we are convinced that she did a commendable job in both respects. Petitioner testified that she regularly had charge of "the office," banking, and correspondence; signed checks and paid bills; that he relied on her in the purchase of stocks for sale to female patrons; that she sometimes accompanied him on purchasing trips, and in his absences took complete charge of the store; that she worked during "business hours and after hours," and helped him "more and more as time went on." Greer Drew corroborated these statements, adding that on occasion she independently purchased merchandise and hired and fired employees.

Such services are vital and are of a managerial character. She rendered them not only during the taxable years, but had done so over many preceding years, and these prior services have a material bearing on the recognition of her status as a bona fide partner. *Lawton* v. *Commissioner* (C. C. A., 6th Cir.), 164 Fed. (2d) 380; *Singletary* v. *Commissioner* (C. C. A., 5th Cir.), 155 Fed. (2d) 207; *Paul L. Kuzmick*, 11 T. C. 288; *Samuel Goodman*, 6 T. C. 987; *Leo V. Marks*, 6 T. C. 659. Petitioner's conveyance of the half interest in the business to her in 1943 as a gift, moreover, does not militate against such recognition, for, as said in *Graber* v. *Commissioner*, *supra*:

* * * The so-called gift, as reflected by the gift tax return, was not intended to afford capital for the purpose of buying an interest in the partnership as in other cases. It was for the avowed purpose of acknowledging the wife's interest * * *. * * * while it adds nothing to the vital question of partnership, it does not detract from the controlling realities.

As petitioner has established that his wife contributed capital, rendered vital services, and shared in the control of Drew's Manstore, the partnership between them, as manifested by the instrument of January 23, 1943, and their subsequent conduct of the business, should be recognized for tax purposes. *Allen* v. *Knott* (C. C. A., 5th Cir.),

166 Fed. (2d) 798; *Graber* v. *Commissioner, supra; Wilson* v. *Commissioner, supra; Paul L. Kuzmick, supra.* And net profits of the business, distributable half to each under the written agreement, should be taxed half to each. *Canfield* v. *Commissioner* (C. C. A., 6th Cir.), 168 Fed. (2d) 907; *Woosley* v. *Commissioner* (C. C. A., 6th Cir.), 168 Fed. (2d) 330; *Reuben Stiefel*, 9 T. C. 576.

In recomputing the net profits of the business, the Commissioner allowed the deduction of all salaries paid in 1944, but disallowed as excessive $11,712.50 of the salaries paid in 1945 to the four sons. By amendments to his answers, he prays that all salaries paid to the sons be disallowed and that increased deficiencies be determined accordingly. On brief, however, he modifies the issue so raised to contend that only the bonus payments should be disallowed. The bonus was $8,000 in 1944, $2,000 being paid to each son, and $20,000 in 1945, $5,000 being paid to each son. So reduced, the sons' salaries, which he now concedes to be deductible, were $1,051.72 in 1944 and $3,212.50 in 1945, distributed as follows:

| Year | Greer Drew | Frank Drew | Lloyd Drew | Cecil Drew |
|---|---|---|---|---|
| 1944 | $1,051.72 | | | |
| 1945 | 1,512.50 | $206.25 | $756.25 | $737.50 |

Respondent argues that the equal distribution of a percentage of annual profits among four sons whose value to the business varied greatly was in effect a gift, not compensation for services, especially since the three sons who were in the armed forces during 1944 and most of 1945 rendered services only for short periods. We should be impressed by this argument if the basic salary paid to each son was large enough to support an inference that it alone was intended as compensation. But in fact the amounts paid them in excess of bonus were too trivial to be considered full compensation. The testimony concerning the rate or method of computation is somewhat confusing, and $30 to $40 a week has been found, although Greer on cross-examination mentioned $300 a month as his, but the totals of $1,051.72 and $1,512.50 received by him above bonus in 1944 and 1945, respectively, would seem to indicate regular payment of even less than indicated by the rate found. In any event, total payments to each are to be deemed deductible salary to the extent that they represent reasonable compensation for services rendered and are nondeductible to the extent that they exceed it. Regulations 111, sec. 29.23 (a) (7)–(8); *In re Rae's Estate* (C. C. A., 3d Cir.), 147 Fed. (2d) 204; *Samuel Rottenberg*, 20 B. T. A. 589.

Leaving for later discussion the effect of absences in the armed forces, and considering first the payments received by Greer Drew, who was not in military service, we find that Greer received $3,051.72

in 1944 and $6,512.50 in 1945. Greer was a seasoned business man, fitted by extensive college training and seven years of practical experience as buyer and, on occasion, as manager of Drew's Manstore, which had an annual sales volume well in excess of $200,000 in the taxable years. There is credible testimony that the amounts paid him were less than the compensation currently paid to qualified men rendering like services. Respondent emphasizes his employment with a lumber company in 1944 and his work in performing a logging contract in 1945 as materially reducing his participation in the clothing business. But Greer testified that he kept constantly in touch with that business and that his other activity fell during the months of the year when the seasonal business of the store required least attention. He engaged in this outside work at the suggestion of his draft board. We have found that the amounts paid him were not excessive, and hold them deductible in full.

The issue in respect of payments to the other 3 sons is complicated by their absence in the armed forces. Frank entered the service in February 1942; he was then 25 years of age, and had been employed regularly in the store for about 3½ years, or since his graduation from the University of Oregon. Lloyd entered the service in February 1943; he was then 24 years of age, and had been employed regularly about 3 years. Cecil entered the service in July 1943; he was then 20 years of age, and had been employed regularly only a month. All three assisted in store work during short leave periods, and all three resumed work in September or October 1945, returning in time for the most active season of the business. Frank and Lloyd also procured some merchandise and made business connections while in the service. In 1943 all the sons received a $1,750 bonus, and Lloyd and Cecil an additional $35 and $110, respectively, inferentially for services actually rendered. In 1944 all received a $2,000 bonus and no more; and in 1945 all received a $5,000 bonus and, in addition, Frank, who did not reach Klamath Falls until November 15, received $206.25, Lloyd received $756.25, and Cecil received $737.50. Lloyd has since remained with Drew's Manstore, but on January 1, 1946, Frank and Cecil left to manage the newly acquired gun store in which each of the five Drews and their wives had a tenth interest.

Admitting, as he must, that the three sons actually rendered little service in 1944 and 1945, petitioner relies on I. T. 3417, 1940-2, C. B. 64, in which the Commissioner, adhering to administrative practice followed after World War I, ruled:

* * * that salaries paid by employers to employees who were absent in the military or naval service * * *, but who intended to return at the conclusion of such service, were allowable deductions from gross income. (See article 108, Regulations 45 (1920 edition), promulgated under the Revenue Act of 1918.)

No provision of the code explicitly permits the deduction, but this Court has approved the ruling, saying in *Berkshire Oil Co.*, 9 T. C. 903, that the salaries:

\* \* \* qualify as a business expense, because such payments are justified by past services and an employer's advantage in retaining the services of experienced personnel when released from service. \* \* \*

But as the deduction is a corollary of section 23 (a) (1) (A), relating to ordinary and necessary business expenses, the salaries paid to those absent in the armed forces must meet the general tests for deduction under that section. *Inter alia*, they must be "reasonable," which we hold for present purposes to mean commensurate with the value of the employee's normal services to the business, and they must be paid as an inducement for the employee's return after discharge, for otherwise no business benefit would be contemplated. If the employee has a proprietary interest in the business or is a close relative of the employer, such relations would not preclude a deduction of the salary paid him *in absentia*, but they do invite a special scrutiny of the payor's motives, for a payment intended merely as a gift is obviously not a deductible expense.

An analysis of the payments made to the 3 younger sons refutes rather than supports the view that they represented merely a continuation of compensation or an inducement to return. The value of their respective services was obviously not the same. Frank, the oldest, was a university graduate who had over 3 years of practical experience; Cecil, the youngest, was only 20; he had attended the university for only one year and had been employed only one month; Lloyd's age and qualifications fell between the two. Yet all three received $2,000 in 1944 and over $5,000 in 1945, and in 1943 Cecil actually received more than the others, although he had not been employed until the middle of the year. When it is considered that Greer too received an equal part of the bonus, which was the major part of the payments in all years, we are forced to the conclusion that petitioner was acting as a father, refraining from parental discrimination, and not as an employer, nicely fixing compensation according to the recipient's commercial value to the firm. He was, of course, at liberty to treat his sons alike, and he may deduct as a proper expense the payments for which commensurate services were rendered. But no business motive can be imputed to his payments of such disparate amounts as $2,000 and $5,000 to sons who were rendering little or no services, especially since they had never received so much for regular work.

We can well believe that petitioner wished them to return to Klamath Falls, but not for commercial reasons of benefit to himself. He arranged during their absence to acquire a second store, and did so, giving each an interest in it. Frank and Cecil were made comanagers of this in January 1946, while Greer and Lloyd remained at the clothing

store. Petitioner cites *Culbertson* v. *Commissioner* (C. C. A., 5th Cir.), 168 Fed. (2d) 979, as an authority supporting his contention, but a partnership between the taxpayer-father and his son, absent, in the armed forces, was there involved. Petitioner's sons were not partners, and his gratuitous distribution of a percentage of profits equally among them can not be regarded as an inducement for their return, since he was already planning to give each a proprietary interest in another store, and he employed two of them in it in January 1946 because the clothing business was not large enough for all.

But this conclusion does not preclude petitioner's right to deduct a part of the amounts paid which represents the fair value of services actually performed. The evidence shows that during a month's leave in October 1944 Frank was active in aiding and making purchases for the store, and that he resumed work for it in October 1945. Lloyd worked a month in the summer of 1945 and permanently resumed work about the middle of September. Cecil resumed work about the first of October 1945. We have found that the fair value of Frank's services was $250 in 1944 and $1,000 in 1945; of Lloyd's services, $756.25 in 1945; and of Cecil's services, $737.50 in 1945. These amounts are properly deductible.

*Decisions will be entered under Rule 50.*