Charles A. Carolin v. Commissioner.
Carolin v. Commissioner
Docket No. 16835.
United States Tax Court
1949 Tax Ct. Memo LEXIS 171; 8 T.C.M. (CCH) 548; T.C.M. (RIA) 49140; June 1, 1949
*171 Donald K. Tyler, Esq., Dime Bldg., Detroit, Mich., for the petitioner. A. J. Friedman, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency of $15,371.06 in petitioner's income and victory tax for 1943 and a deficiency of $17,317.66 in his income tax for 1944, in part by adding to income reported 20 per cent of the profits of a partnership which were distributable to his wife under the terms of a partnership agreement. Petitioner contests the determination that the wife is not recognizable as a partner. He also contests disallowance as a deduction of contributions to Technocracy, Inc. Findings of Fact Petitioner, a resident of Berkley, Michigan, filed his income and victory tax return for 1943 and his income tax return for 1944 with the collector of internal revenue for the eastern district of Michigan. His wife, Helen E. Carolin, filed separate returns for those years with the same collector. Petitioner's father, Robert B. Carolin, began a small iron foundry in Detroit about 1912. During the first World War his business increased in size, and at times he employed as many as twenty *172 men. After 1918, however, it began to decline. For lack of orders and modern equipment it was very unproductive by 1933, and Carolin was in financial straits. By 1937 he had only one employee and his shop was in serious need of repair. To provide $50 a week for the maintenance of himself, wife and family, he had allowed taxes to fall in arrears and had borrowed money, using his home and insurance policies as collateral. He died suddenly on November 20, 1937, leaving his widow, Louise W. Carolin, and nine children surviving. Petitioner, then 22, was next to the youngest. Robert B. Carolin left assets valued at about $23,000, of which about $12,000 was attributed to the foundry. He owed about $3,500 in debts and taxes. Petitioner was then living at his parents' home and was employed as a salesman of soaps. He was engaged to be married to Helen Zawada who was working as a stenographer at a salary of $1,250 a year. His mother, much worried about financial matters and wishing to continue her husband's business, urged him to give up his job and work at the foundry. Her three elder sons had refused to do so, stating that the shop was too obsolete and the equipment too worn for profitable *173 operation. Petitioner and his financee agreed to postpone marriage to facilitate petitioner's compliance with his mother's request and petitioner started work at the foundry for $30 a week shortly after his father's death. As the widow inherited one-third of her deceased husband's estate and each of the nine children, two twenty-sevenths, petitioner exacted a promise from her that she would get all the children to assign their interests in the foundry to her. His fiancee had insisted on this arrangement, promising to keep her job and to help petitioner with the foundry work if the business was protected against future claims of his brothers and sisters. With his fiancee's approval he later declined a favorable offer of employment to continue his work at the foundry. The mother's settlement with the children was attended with difficulties, but on November 12, 1938, or a few weeks after entry of an order of the probate court fixing the heirs' shares, eight of the children gave to her a quit-claim deed of their interests in the real estate and appurtenances constituting the foundry. The ninth child did likewise on August 21, 1941. Petitioner received nothing as consideration for the *174 quitclaim deed he gave, but three of his brothers demanded and obtained notes. A bill of sale covering the personalty was also executed, and on December 9, 1938, the widow filed with the clerk of Wayne County, Michigan, a certificate of conducting business under the assumed name of R. B. Carolin Foundry. Prior to this time and on September 17, 1938, petitioner and his fiancee were married and thereafter resided at his mother's home, where the three often discussed business matters and reached decisions. Among these was a major decision to accept a contract for certain work from Clayton & Lambert Co. in January 1939. This contract proved to be very profitable, but in the condition of the business at the time considerable risk was involved. To revive the enterprise, petitioner devoted long hours to work, and used his own car for business purposes without receiving extra payment therefor. His wife helped him in clerical matters at the shop on Saturdays and Sundays and sometimes handled correspondence at home on evenings of other days. Although some progress was being made, the need for repairs entailed so much expense that no surplus funds accumulated, and he and his wife were discouraged *175 by the prospects. At his wife's urging he requested of his mother some recognition of a proprietary interest if he was to continue, and on July 29, 1939, his mother and he signed an agreement to conduct the business as partners under the name of R. B. Carolin Foundry. They recited in the agreement that the mother had contributed her interest in machinery, equipment and good will as capital and that petitioner had contributed his interest in the same property and was to contribute further his skill and experience. They agreed that each share equally in profits and losses; that petitioner devote his undivided time and attention as manager and receive compensation therefor; that the partnership assume all debts and liabilities of the business; that the real estate constituting its premises remain the property of the mother and be rented to the partnership, and that the partnership be continued (unless previously dissolved by mutual consent) after the death of either partner, each agreeing to bequeath to the other one-ninth of his interest and reserving the right to dispose of the rest by will. The last provision was intended to insure control to the survivor. A certificate that petitioner *176 and his mother were conducting the business as partners was promptly filed with the county clerk. Petitioner continued to manage the enterprise as before and his wife, who kept her stenographic position until early in 1941, rendered assistance as before until late in 1940. In lieu of paying rent for the premises to the mother, the partnership paid taxes on them, including arrears. Early in 1941 the partnership, after expanding its activities, employed an accountant who, in discussing problems with petitioner, suggested incorporation as a better means of protecting petitioner against possible difficulties with his brothers and sisters after his mother's death. The mother was agreeable; the partnership was formally dissolved, and on October 1, 1941, the R. B. Carolin Foundry & Machine Co. was organized as a Michigan corporation with a paid-in capital of $10,000, represented by 10,000 $1 par value shares, of which petitioner subscribed for 5,000 and his mother for 5,000. They and Edward C. Boss were named directors. The partnership's assets (except cash) and liabilities were taken over by the corporation, which immediately issued a certificate for 4,500 shares to "Charles A. Carolin *177 and Helen Carolin"; a certificate for a like number to petitioner's mother, and a certificate for 1,000 shares to "Charles A. Carolin and Louise W. Carolin, Joint Owners with right of survivorship." Petitioner became president and treasurer, and his mother, secretary, with a salary of $200 a month. On October 1, 1941, the mother leased the business premises to the corporation for $200 a month or 2 per cent of gross sales, whichever was greater. By this time the foundry had fifty employees; the manufacture of screw machine products was begun; contracts for airplane wing sections had been obtained from the Chrysler Corporation, and numerous used machines were being bought rebuilt, and added to the plant's equipment. Business increased enormously with orders for military requirements, and on its income tax return for the first fiscal year ended September 30, 1942, the corporation reported gross sales of $387,996.10, gross profits of $149,321.20, and a net income of $74,081.84. There were no distributions to stockholders but $24,808.71 was paid to petitioner as salary; $200 a month to his mother as salary and $6,808.71 as rent. An RFC loan of $140,000 was procured and repaid. Before *178 the end of 1942 renegotiation of the war contracts started, and deduction of the amounts paid to the mother were challenged in the computation of profits and were ultimately disallowed. After consulting an attorney, who specialized in tax matters, petitioner and his mother, as stockholders representing all outstanding shares, resolved on March 11, 1943, that: "(I) The Corporation sell to a co-partnership to be formed by Mr. Charles A. Carolin, Mrs. Louise W. Carolin and Mrs. Helen E. Carolin, all of the unfilled contracts and purchase orders on hand, all the inventory of raw material and work in process, both in the foundry and in the machine shop and all of the cash in the National Bank of Detroit in an amount of approximately $10,000.00 and all sums due from employees." The recited consideration was $3,000 payable by the partners, the proposed partnership's note for $14,500 and its assumption of listed corporate obligations. On July 1, 1943, "but as of April 1, 1943", petitioner, his mother and his wife signed articles of co-partnership to conduct a machine shop and foundry business under the name of R. B. Carolin Foundry & Machine Co. Contribution of 50 per cent of the capital *179 by petitioner, 25 per cent by his wife and 25 per cent by his mother was recited, and the profits were to be distributed 40 per cent to petitioner, 40 per cent to his mother and 20 per cent to his wife. Each of the three agreed "to devote so much of his time, skill and energy necessary to the best interests" of the partnership; correct records were to be kept, and partnership funds were to be deposited in a bank account subject to withdrawal by one of the partners or by an authorized agent. A certificate of co-partnership was signed and filed by the three on June 21, 1943, with the county clerk. The corporation, however, was not dissolved; but its name was changed to The Carolin Manufacturing Corporation. It retained the lease from the mother on the business premises, and immediately subleased them to the partnership for $1,000 a month; it also retained machinery and equipment which it leased to the partnership, and it held the partnership's $14,500 note. By bill of sale dated July 1, 1943, "but as of April 1, 1943," the corporation transferred to the new partnership all assets described in the stockholders' resolution, and the partnership gave to the corporation its demand note *180 for $14,500, dated March 31, 1943. Entries as of the latter date were made on the corporate books to reflect a transfer of assets, having a book value of $42,078.37, comprising raw materials, work in process, cash of $10,930.75, and contracts for $290,662.80 of work, entered as an asset at $14,531.14. By entries of the same date liabilities aggregating $24,907.47 were eliminated, comprising $12,869.80 due petitioner for salary. The opening entries on the partnership's books indicated assets of $42,078.37, transferred by the corporation, and a note receivable of $1,335.45 due from petitioner's wife, or a total of $43,413.82. The listed liabilities of like amount comprise "invested capital" of $2,670.90, representing a transferred note due the corporation from petitioner's mother; $1,335.45, representing a note in that amount given the partnership by petitioner's wife, and $1,335.45, representing a part of the salary due petitioner by the corporation. The remainder due him, or $11,534.35, appeared also as a liability of the partnership. Petitioner's wife paid her note by a check drawn against a joint bank account in the names of petitioner and herself. Early in 1941 petitioner purchased *181 a residence in the joint names of himself and wife for $9,400, and they ceased to live with his mother. His wife continued to discuss business affairs with him at home; their personal relations were close, and he was appreciative of her encouragement and assistance in clerical work at the foundry from 1938 to the latter part of 1940. From her own savings she had given him $260 for house furnishings prior to their marriage; she contributed $350 in July 1939 to the purchase of an automobile used largely in the business, and $400 for a second car purchased in September 1941. Title to both cars was taken in their joint names. She also used over $1,500 of her separate funds for living expenses after marriage and she paid medical bills of $225. After the birth of her first child in September 1941 she changed her separate account into a joint account of herself and husband for convenience. This account was closed by a withdrawal of $1,669 in October 1945. The corporation reported a loss of $8,937.39 for the fiscal year ended September 30, 1943, and it lost about $22,000 during the period between October 1942 and April 1943 on account of numerous rejections of products and the retooling *182 of equipment for performance of new contracts. But the business again prospered after the partnership took it over and adopted some managerial changes. The partnership's income tax return filed for the period April 1-December 31, 1943, disclosed net profits of $152,760.70, later reduced, however, by $50,000 after the renegotiation of war contracts. Petitioner and his mother were each credited with 40 per cent, or $61,104.28, and petitioner's wife with 20 per cent, or $30,552.14. Each reported his respective share on an individual income and victory tax return. Petitioner and his wife withdrew $28,400 and $14,200, respectively, of the shares credited to them, and each deposited the amount withdrawn in their joint bank account. The deposits were used for the payment of living expenses and income taxes and a large balance remained. For the year 1944 the partnership reported net profits of $114,855.19, of which $45,942.08 was credited to petitioner; a like amount to his mother, and $22,971.03 to his wife. Each reported his respective share on an individual income tax return. Petitioner and his wife made withdrawals of $54,800 and $21,900, respectively, which they deposited in their joint *183 bank account. During 1944 they used funds from the account to pay living expenses and income taxes, and invested about $20,000 in two single premium policies of insurance on petitioner's life, the wife being named beneficiary. They withdrew $10,000 and placed it in a safe deposit box to which each had access. Petitioner's wife spent $1,800 on a trip for health purposes and $600 for jewelry. A large balance remained on deposit. Petitioner's wife had a separate savings account, but did not deposit any funds withdrawn from the partnership in it. The corporation also filed an income tax return for its fiscal year ended September 30, 1944, under its new name of Carolin Manufacturing Corporation. Its gross income consisted of $150 interest on notes and the $12,000 paid to it by the partnership as rent under the sublease. It deducted $2,400 paid to petitioner's mother as rent under the original lease; $720 paid to petitioner, its president, as salary; $480 paid to his mother, its secretary, and various other amounts as interest, taxes, insurance, and depreciation. The depreciation of $6,324.21 was claimed on account of foundry machines and equipment, lease improvements, furniture and an *184 automobile. The resulting taxable net income was $886.05. In 1943 petitioner contributed $155 to Technocracy, Inc., a New York corporation not organized for profit. In determining petitioner's income and victory tax for 1943 the Commissioner recomputed partnership profits by eliminating the $50,000 refunded after renegotiation of the war contracts, and included 60 per cent of such profits in petitioner's taxable income, reflecting the addition of the 20 per cent share, as adjusted, reported by his wife. He disallowed deduction of the $155 contributed to Technocracy, Inc., which petitioner had claimed on his return. In determining petitioner's income tax for 1944 the Commissioner added to income the $22,971.03 partnership profits reported by petitioner's wife and disallowed an $111 contribution to Technocracy, Inc., which petitioner had claimed as a deduction. Opinion In the determination of petitioner's income and victory tax for 1943 and income tax for 1944 the Commissioner recognized petitioner and his mother as members of a partnership, but denying such recognition to the wife, added to petitioner's income the 20 per cent of partnership profits distributable to her under *185 the terms of the agreement signed July 1, 1943. He defends that determination by the argument that the wife contributed no capital or services to the business; did not share in its management and control, and should not be recognized as a partner for tax purposes under the Supreme Court's reasoning in Commissioner v. Tower, 327 U.S. 280. Petitioner contends to the contrary that she should, claiming that she rendered valuable services for some time after the business was operated by him; made indirect capital contributions during the years 1938-1940, and paid in 25 per cent of the capital when the partnership in controversy was formed; that she participated in management and control, and understood from 1937 that she had an interest in the business, derived from his mother. Although the partnership in controversy did not come into existence until 1943, capital and vital services contributed by a wife to the building of a husband's business prior to her admission as a partner have been judicially considered relevant in holding her partner-status recognizable for tax purposes, Canfield v. Commissioner (C.C.A., 6th Cir.), 168 Fed. (2d) 907; N. B. Drew, 12 T.C. 5; *186 Willis B. Anderson, 6 T.C. 956, even where she contributed no capital and rendered no services after the partnership was formed. Singletary v. Commissioner (C.C.A., 5th Cir.), 155 Fed. (2d) 207; Paul L. Kuzmick, 11 T.C. 288. But we can not find on the record before us that the wife's services here shown were vital or that she even purported to make capital contribution prior to July 1943. She encouraged petitioner to quit his job as a salesman and to work at the foundry. She agreed to postpone their marriage that he might do so. She kept her stenographic position until early in 1941, and she loyally assisted him in clerical work on weekends and evenings until the middle of 1940. But these services were of a personal nature with exception of the clerical work, and that we can not consider vital. The wife was merely "helping out". Cf. Bradshaw v. Commissioner (C.C.A., 10th Cir.), 150 Fed. (2d) 918; John P. Denison, 11 T.C. 686; Edwin F. Sandberg, 8 T.C. 423. Petitioner and she were not jointly starting an enterprise as was true of the spouses in Singletary v. Commissioner, supra, and Paul L. Kuzmick, supra. *187 The foundry had been in existence for years, and petitioner was initially employed to continue its operation. It is true that he had hoped to be rewarded with a participating interest, and that this expectation was realized when he and his mother signed the first partnership agreement in July 1939. But the agreement was impossible before the brothers and sisters had consented to convey their interests in the foundry to their mother, and their opposition to the proposed partnership had been overcome. Petitioner would have us regard as a capital contribution the wife's separate funds applied to the purchase of household furnishings and to the payment of living and medical expenses and the several hundred dollars used in successive purchases of two automobiles. Admitting that title was taken in their joint names, he argues that the automobiles were used largely for business purposes, and therefore the part of their purchase price paid by his wife was a contribution by her to the business. We are not impressed by these contentions. The living expenses and medical bills involved disbursements for personal purposes and the house furnishings and automobiles were personal assets. And this *188 essential character is not altered because the automobiles were often used on business trips. Nor can we agree with the view that the wife acquired a partnership interest from petitioner's mother. He argues that it was understood when he consented to operate the foundry that his wife, himself and his mother would have proprietary interests in the business; that his mother, as sole owner of the plant after the children had conveyed their interests to her, was the source of his wife's interest, and as his wife did not derive such interest from him, the income from it may not be taxed to him. Sinne B. Forsythe, 10 T.C. 417; S. Kenneth Alexander, 6 T.C. 804. But the partnership agreement of July 29, 1939, and the assumed name certificate, publicly filed, failed to include the wife as a partner. If the alleged understanding was reached, it was not legally implemented, and even if the wife had made recognizable contributions to the business, we could not deem her a partner in derogation of a formal agreement which assigned all interest in the partnership to others. In the second agreement of July 1943, however, the wife formally joined with petitioner and his *189 mother in signing articles of partnership, and agreed to provide 25 per cent of the capital. Prior to this agreement, and on October 1, 1941, the first partnership had been dissolved, and a newly organized corporation had taken over its assets (except the real estate) and liabilities. Of this corporation's 10,000 shares, 4,500 had been issued in the joint names of petitioner and his wife. When the second partnership was formed to succeed to the corporate business, however, the corporation was not liquidated. It sold most of its assets to the new partnership, receiving a note signed by petitioner and his mother and his wife as partners, and continued to exist, collecting interest and subleasing the real estate. Petitioner argues that the wife's "vested interest in 4,500 shares of the corporate stock gave her a property interest in the foundry business which property interest carried over to the partnership in question." He likens the situation to the contribution of liquidated corporate assets by stockholding members of a family to a partnership formed by them such as was considered in Kent v. Commissioner (C.C.A., 6th Cir.), 170 Fed. (2d) 131; Lawton v. Commissioner (C.C.A., 6th Cir.), 164 Fed. (2d) 380; *190 Reuben Stiefel, 9 T.C. 576. But obviously there is no analogy, for whatever interest petitioner's wife may have had in the corporation by virtue of the 4,500 share certificate remained an interest in the corporation. There was no liquidation of its properties to shareholders and a simultaneous contribution of such properties by them to the second partnership. What that partnership acquired was purchased from the corporation. Its books also showed partners' contributions of $5,341.80, but in petitioner's own words his contribution of $1,335.45 and his mother's contribution of $2,670.90 were supplied "by the mechanics of balancing the books." As more clearly explained, amounts owed to them by the corporation were assumed by the partnership, and portions of these debts were cancelled as obligations and entered as contributions to capital. No new capital was brought into the business by these book entries. Petitioner's accountant testified: "* * * The question of this capital was relatively unimportant * * * based upon the fact that the interest [of a partner] arose out of the corporation ownership and not out of additional cash contributions." Petitioner stated that *191 to match his contribution, his wife "gave a check for $1,335 * * * from the joint account of ours." But the opening book entries indicate that she gave a note, and we have found that she gave a note and paid it off with funds in the joint account. On this record the only evidence of a contribution of any kind by the wife is the $1,335.45 check for payment of the note. And it was drawn not against her separate funds but against funds on deposit in the joint names of petitioner and herself. There is no evidence that any part of the funds in this account originated with her, and as she had made use of her savings for house furnishings, living expenses and the purchase of automobiles and was not employed after 1940, we have no reason to infer that any funds in the account in 1943 did originate with her. Petitioner makes an additional argument that she exercised control over the business by urging him to work at the foundry in 1937; to accept the contract of Clayton & Lambert Co. in 1939; to convert the first partnership into a corporation. He testified in general terms that he discussed business matters with her at home. In so far as the advice and discussions were not of a personal *192 nature and hence irrelevant to the issue, the evidence is not sufficient to establish that they were more than phases of the marital relation. We sustain respondent's determination that the wife should not be recognized as a partner for tax purposes. Petitioner also contests the disallowance as a deduction of contributions to Technocracy, Inc. By section 23 (o) (2), Internal Revenue Code, an individual may deduct a contribution to a domestic corporation organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, no part of the earnings of which inures to the benefit of an individual and which does not seek to influence legislation. But the burden rests on petitioner to prove that the donee meets the prescribed tests, Adam Ortseifen, 14 B.T.A. 1403, and his meager testimony concerning Technocracy, Inc., fails to sustain that burden. Decision will be entered for the respondent.