OPINION. Withey, Judge: Petitioner contends that the membership in the Notary Club afforded an opportunity for Louis, its president, to contact leading business and professional citizens of the community and create good will for the business. Substantial evidence is required to establish a right to deduct club dues as a business expense. George K. Gann, 41 B. T. A. 388. Cf. Smith-Bridgman & Co., 16 T. C. 287, 295. The fact that Louis paid the sum out of his personal funds during the course of his membership in the club for 21 years prior to the taxable year without any contention or proof that he sought reimbursement from petitioner or its predecessors, infers that he did not regard the cost as an ordinary and necessary business expense of his employer. He was prompted, according to his testimony, to seek reimbursement from petitioner in 1943 by advice from an unknown source, that petitioner should and could under the provisions of the Internal Eevenue Code pay the expense. The effect of other testimony of Louis is that he regarded his membership in the club as having no connection with the business of petitioner. The evidence here does not justify a reversal of the respondent’s action in denying the deduction. Accordingly, we sustain his determination that the amount is not an ordinary and necessary business expense of petitioner. Of the salaries of $4,900, $5,000, $5,300, and $5,410 paid to Irwin during the respective taxable years, respondent allowed $4,300 each year and of the amounts of $3,725, $3,800, $3,980, and $4,322.50 paid to Max, he allowed $3,500 each year. The salaries paid included bonuses at the rate paid other employees, but the amount has not been shown. Irwin and Max were employees of petitioner in 1941 but the amount paid to each was not shown by evidence in this proceeding. Petitioner asserts in its proposed findings that during the taxable years they were paid at the same rate as in 1941, plus an additional amount under a bonus system applied to all employees and refers to the approval of the 1941 compensation by this Court in a memorandum opinion entered in Docket No. 2053. That proceeding involved the disallowance by the Commissioner of a special bonus of $2,000 paid to each, out of a total salary of $4,402.53 paid to Irwin and $3,501.26 paid to Max. We found that the regular salary of Irwin was $2,150 and of Max $1,375 and that the remainder paid to each consisted of a bonus paid to all other employees. Louis testified here that he testified in that proceeding that the special bonus was paid because, among other things, of additional responsibilities assumed by Irwin and Max during his absence from the business on account of sickness. That fact was considered by us in reversing the respondent’s action and allowing the entire amount as a deduction. No contention is made that they had additional responsibilities in 1942. Irwin was absent in military service from January 1943 until November 1945 and Max from September 1942 until the same time and consequently performed no service for petitioner during such times. Salaries paid to employees during absence in the military service are allowable as deductions upon the ground that they are “justified by past services and an employer’s advantage in retaining the services of experienced personnel when released from service.” Berkshire Oil Co., 9 T. C. 903. The effect of the respondent’s determination of $4,300 as reasonable compensation for Irwin and $3,500 for Max was to allow the special bonus again in 1942, when Max was absent in military service for about 4'months, and in subsequent taxable years when both of them were on duty with the Navy until November 1945. Here, where the employees were stockholders and sons of the administrative head of the business, the motive for the payments is important. N. B. Drew, 12 T. C. 5. It does not appear from the evidence that replacements were required during the absence of the employees or that salary payments were required to insure their return to the business after their discharge from the Navy. Under the facts of record we are not warranted in disturbing the salary allowances made by the respondent. Accordingly, we hold for the respondent on this issue. The third and primary issue is whether, as determined by respondent, the petitioner is taxable on the income of the partnership. The petitioner contends that the partnership was not a sham, and, therefore, should be recognized for tax purposes as a separate and distincl enterprise. The broad contention of respondent is that the various steps taken were paper transactions, without a sound business purpose, to siphon off income of petitioner for the temporary benefit of its two controlling stockholders. An established rule is that a taxpayer may select any form of organization through which to conduct business and is under no compulsion to adopt a type that will yield the greatest amount of tax revenue. Coca-Cola Bottling Co. of Sacramento, Ltd., 17 T. C. 101, and cases collected therein on the point. In that case we said: However, if the form of a business enterprise which a taxpayer adopts is a sham and a device to evade the burden of taxation, the law allows looking through the form to reality and disregarding the selected form of the business. Higgins v. Smith, 308 U. S. 473; Gregory v. Helvering, 293 U. S. 465. See also National Carbide Corporation v. Commissioner, 336 U. S. 422, in which the Court said that “Escaping taxation is not a ‘business’ activity.” The device employed here was a dual family partnership to own and operate six of the nine stores being conducted by petitioner. Family partnership not created in good faith for a business purpose may be disregarded and the profits from operations “taxed to him who earns it,” Commissioner v. Culbertson, 337 U. S. 733. Petitioner asserts that after prolonged discussion between and among Louis, Perlman, and the three Friedlander boys a determination was made in the fall of 1942 to set up for the boys a business which they could manage and control upon their return from military service and that 3 or 4 months later Louis requested petitioner’s accountant to draft, with assistance of counsel, articles of copartnership containing provisions for the acquisition and operation of stores outside of Moultrie and the Smart Shop in that city. The alleged purpose is contrary to the facts of record. No proof was made of the alleged determination by all of the interested parties at any time prior to the execution of the partnership agreement. Malvin, who did not enter military service until February 1943, did not participate in the discussions, and Max took no part in the final discussion to form a partnership. Irwin did not discuss a division of the business until after he entered the service of the Navy in January 1943, and Perlman could recall no discussion on the subject until the early part of 1943. No contention is made that the wives ever participated in consideration of the plan, or that they “rendered any services to the partnership which would have the effect of validating it.” It was not until about June 1, 1943, which was after petitioner’s income tax return for 1942 was filed, that Louis requested the accountant “to get busy” and create a partnership as soon as possible. None of the alleged partners other than Louis conferred with the accountant on the subject and it does not appear from the evidence that they were aware of any of the terms of the agreement until it was presented to them for signature. The inference from the facts is that Louis dictated the plan and that the other partners accepted, without protest, whatever he chose to do. The point has particular significance because six of petitioner’s stockholders, who held about 30 per cent of its stock, were not assigned partnership interests and the wives were not stockholders. The result was a division of corporate assets disproportionate to stockholdings. There is no indication in the evidence that nonparticipating stockholders of petitioner were consulted. Any bona fide division of corporate activities for business purposes would have recognized the interests of the minority. Petitioner’s position with respect to the business purpose which necessitated creation of the partnership may be broadly stated as follows: that it was, prior to the formation of the partnership, a closely held dual family corporation with the exception of some very minor stockholders; that disputes arising between Louis’ sons and Perl-man because of their greatly divergent views on the subject of merchandising were a disrupting unhealthy factor in the conduct of corporate business affairs; that the partnership provided a means whereby a complete separation of fields of authority would be obtained and also provided a business separate from the corporation in which the sons’ ideas and business capabilities could be put to use and developed. That the purpose above stated was not in the minds of the parties to the partnership agreement becomes fairly obvious in the light of circumstances existing at the time the partnership was created and in-the light of events subsequent thereto. On July 1, 1943, the date of execution of the partnership agreement, all three of Louis’ sons were in the armed services. Their availability to participate in partnership affairs could not then be anticipated. Their discharge from the armed services would occur at some unascertainable future time. Certainly they were not in a position to be a disruptive influence in corporate affairs while so engaged, and they were certainly not then in a position to manage partnership affairs. It is also worthy of note that the term of the partnership agreement was only 5 years. So short a term is more consistent with an intent to adopt the partnership form for tax reasons only, than with an intent to provide a real and permanent business organization for the development of the business ideas and capabilities of very young men. That such was not the real purpose behind the creation of the partnership is apparent when it is considered that Perlman, the arch rival of the sons in merchandising matters, was the person who, during the sons’ absence and thereafter, managed the stores held by the partnership with the same authority and in the same manner as when said stores were owned by the petitioner. In fact, we are unable to discover any real difference in the fields of authority and methods of conducting business on the part of Louis and Perlman after creation of the partnership. In view of the foregoing we are forced to the conclusion that the creation of the partnership was for the sole purpose of siphoning off the profits of petitioner with resulting tax benefits being the ultimate goal. The transfer of assets did not flow from an arm’s length transaction. The merchandise, scarce at that time, was transferred at mere invoice cost price, and, therefore, excluded amounts for transportation, handling and other charges that enter into the total cost of goods. It discloses a purpose of petitioner to place others in a position to make profits at its expense; a release of earnings without consideration. R. O. H. Hill, Inc., 9 T. C. 153. Aside from the transfer of merchandise at less than actual cost to petitioner, no consideration was paid for the value of the stores as going concerns. The large amount of good will value of the stores is demonstrated by the earnings of $395,000 of the partnership during its existence of 33 months without a cent of capital contributions, an amount of earnings $166,-000 in excess of the net income of petitioner for the calendar years 1943, 1944, and 1945. The fact that some consideration was given as early as September 1942 to a plan for dividing the business of petitioner is not decisive. The evidence here does not disclose any of the details of the scheme considered at that time, and, therefore, we are not in a position to say to what extent they were put into effect. Our answer must be found in what was actually done. In Buffalo Meter Co., 10 T. C. 83, there was a severance of non-dependent divisions of the enterprise in an arm’s length transaction. In Chelsea Products, Inc., 16 T. C. 840, affd. 197 F. 2d 620, the corporations organized to sell the corporate taxpayer’s products had essentially the same stockholders and were held to have been organized for business purposes. Legitimate business reasons were the basis for the division in Palm Beach Aero Corporation, 17 T. C. 1169. Here there was no substantial change in the operation of the stores after they were transfererd to the partnership. Petitioner’s officers continued to operate the stores without any material change of procedure and petitioner paid, without apportionment, nmnerous classes of expenses that would be chargeable to an independent entity. The outward appearances of separateness are frequently found in division of a business amounting to no more in the final analysis than paper transactions. Louis, the architect of the plan, testified, in effect, that taxation was the predominant motive for the creation of the partnership. Such a purpose, if the plan for its accomplishment is not unreal or a sham, is of course not fatal, but the separation here was only nominal and availed of for the obvious intent of temporarily reallocating, without consideration or business reasons, petitioner’s income among family groups of petitioner’s selection. Only by its action could a scheme of the kind involved here have been put into effect. Such anticipatory arrangements are ignored for tax purposes. Lucas v. Earl, 281 U. S. 111; Harrison v. Schaffner, 312 U. S. 579. Eeviewed by the Court. Decision will be entered wnder Rule 50.