[No. 5568.]

RUSSELL ET AL. v. THE COURIER PRINTING AND PUBLISHING COMPANY.

1. **Contracts—Validity—"Public Policy"—Words and Phrases.**

"Public policy," with respect to the administration of law, is that rule of law which declares that no one can lawfully do that which tends to injure the public or is detrimental to the public good; and contracts contrary to public policy are void, and if either party to such a contract seeks redress from the other, he will be left by the courts in the position in which he placed himself—the rule being, to protect the public by preventing such contracts being made, and avoiding evils which naturally result therefrom.—P. 325.

2. Contracts—Validity—Public Policy.

In determining from the particular facts of each case whether a contract is contrary to public policy and therefore unenforceable, the test is not so much what acts the parties performed or contemplated doing in order to carry out their agreement or its actual result, but rather whether or not its tendency is evil.— P. 326.

3. Same.

Agreements for procuring government contracts, where compensation is contingent upon the success of the promisee's efforts, are void as against public policy without reference to whether improper means are contemplated or employed in their execution, as the law conclusively presumes that the tendency of such agreements is evil, and removes temptation by refusing them recognition in the courts; and, since every citizen is interested in a pure administration of the affairs of government in order to obtain this desired end, the law will not lend its aid to the enforcement of a contract of a character which tends to tempt one or both to resort to improper influences to secure such contracts.—P. 326.

4. Same.

Chapter 78, Sess. Laws 1901, fixes the rate of compensation for legal advertising in newspapers at so much for each insertion; and § 2, art. XIX, Colo. const., requires that notices of proposed amendments thereto shall be published in not more than one newspaper of general circulation in each county for four successive weeks. The secretary of state ordered the publication of proposed amendments in plaintiff's weekly newspaper, and thereafter defendant, desiring to publish the amendments in its daily paper, agreed with plaintiffs that, in consideration of plaintiff's relinquishment of the order for publication and the furnishing of stereotyped plates of the amendments, defendant would pay plaintiffs one-half the amount received by it for such publication in its daily paper. This agreement was entered into before their contract or defendants had made its contract with the state, and there were other papers which might have been selected by the secretary of state. Plaintiffs were required to publish only once a week, but the contract secured by defendant provided for daily insertions, so that defendant would receive as compensation more than six times what plaintiffs were to receive, which amount was to be divided between them; but there was no suggestion that either party employed, or intended to employ, any improper means to carry out the terms of the agreement. Held, that plaintiffs could not enforce the agreement, it being

contrary to public policy in that its carrying out depended upon
the parties' ability to induce the secretary of state to release
plaintiffs from their obligation and to make a bigger contract
with defendant, and this offered a temptation to resort to im-
·proper means.—P. 327.

*Error to the District Court of Larimer County.*
    *Hon. Christian A. Bennett, Judge.*

Action by Howard Russell and Walter B. Shep-
pard, copartners as Russell & Sheppard, against The
Courier Printing & Publishing Company.   From a
judgment for defendant, plaintiffs bring error.

                                  ·          *Affirmed.*

Mr. GEO. W. BAILEY, Mr. THOMAS J. LEFTWICH,
and Mr. NEWTON W. CROSE, for plaintiffs in error.

Mr. J. FRED FARRAR, for defendant in error.

The question presented by plaintiffs in error is,
whether the contract which they undertook to enforce
against defendant in error is void as being against
public policy.   The trial court held that it was, and
they bring the case here for review on error.

By the amended complaint it appears that plain-
tiffs obtained from the defendant the following con-
tract:

"WHEREAS, David A. Mills,  Secretary of State
of Colorado, has ordered the publication of proposed
amendments to the constitution of said state, as pro-
vided for in Senate Bills Nos. 1, 2, 21, 317 and 318,
in the Fort Collins Express, owned by Russell &
Sheppard; and

"WHEREAS, The Courier Printing & Publishing
Company desires to have said contract annulled and
a new one made for the publication of the said pro-
posed amendments in its paper, The Daily Courier.

"Now, THEREFORE, Said The Courier Printing
& Publishing Company agrees that in consideration

of the relinquishment of said order for publication by
said Russell & Sheppard and the furnishing by said
Russell & Sheppard of the stereotyped plates of said
amendments, it will pay to said Russell & Sheppard
one-half the amount received by it for said publica-
tion in said Daily Courier, less such sum as may be
paid to the Republican State Central Committee by
said The Courier Printing & Publishing Company.''

Plaintiffs alleged in their amended complaint,
in substance, so far as necessary to notice, that be-
fore securing this agreement they owned and pub-
lished a weekly newspaper at Fort Collins, in the
county of Larimer, known as The Fort Collins Ex-
press; that at this time there was also published in
Larimer county six other weekly newspapers; that
the secretary of state ordered the publication of cer-
tain proposed amendments to the constitution; that
they accepted the order made by the secretary of
state, entered into a contract with him for the publi-
cation of such amendments, and prepared stereo-
typed plates for the printing thereof; that there-
after they learned that it was the policy of the secre-
tary of state, so far as practicable, to publish the
notices of such amendments in daily, instead of
weekly, newspapers; and that the defendant, through
its manager, represented to them that if they would
rescind the contract which they had made with the
secretary of state for the publication of such pro-
posed amendments, that he, the manager, believed
he could secure the publication thereof in the daily
paper published by the defendant, and requested the
plaintiffs to rescind their contract, so that the secre-
tary of state would be at liberty to award a contract
to the defendant, and the defendant, through its man-
ager, then and there proposed to pay them, as a con-
sideration for rescinding such contract, one-half of
the amount received by it on account of such publica-

tion, less any amount that it might contribute to the expense of the Republican state central committee; that plaintiffs accepted the foregoing proposition, whereupon the defendant executed and delivered to them the agreement above set forth. It is then alleged that, relying upon this contract, they rescinded the contract made with the secretary of state for the publication of the proposed amendments, and requested him to cancel it, which was accordingly done, and that thereafter the secretary of state made a new contract with the defendant for the publication of such proposed amendments, they, the plaintiffs, furnishing the defendant the stereotyped plates therefor.

It is further alleged that the defendant received from the secretary of state the sum of $1,200.60 for the publication of such amendments; that it did not contribute anything to the Republican state central committee, and judgment is prayed against it for one-half of the amount so received.

Mr. JUSTICE GABBERT delivered the opinion of the court:

Public policy, with respect to the administration of the law, is that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good.—23 Cyc. 455. All contracts contrary to public policy are void. If either party to a contract of that character seeks redress from the other, he will be left by the courts in the position in which he placed himself. It does not sound well for a defendant to say that a contract which he deliberately entered into, and of which he has had the benefit, is void because contrary to public policy; but, it is not for his sake, or for his protection, that the objection is allowed, but for the protection of the public, by thus preventing this character of contracts being made, and avoiding evils

which naturally result therefrom.—*Hope v. Linden Park Assn.*, 58 N. J. Law 627; *Drake v. Lauer*, 86 N. Y. Supp. 986.

It is clear that contracts contrary to public policy cannot be enforced, but the difficulty arises in determining whether a given contract comes within this rule. Each case, therefore, where the question is raised, must be determined from its own particular facts. In determining this question the test is not so much what acts the parties performed or contemplated doing in order to carry out their agreement, or its actual result, but, rather, whether or not its tendency is evil.—*Wood v. Casserleigh*, 30 Colo. 287; 97 Am. St. Rep. 138; *Tool Co. v. Norris*, 2 Wall. 45; *McMullen v. Hoffman*, 174 U. S. 639; *Richardson v. Crandall*, 48 N. Y. 348; *Atcheson v. Mallon*, 43 N. Y. 147; 15 Am. & Eng. Enc. Law 934; 3 Supp. Enc. 496.

The supreme court of the United States has declared, in effect, that agreements for procuring government contracts where compensation is contingent upon the success of the promisee's efforts, are void as against public policy, without reference to the question of whether improper means are contemplated or employed in their execution, for the reason that the law conclusively presumes that the tendency of such agreements is evil, and closes the door to temptation by refusing them recognition in the courts.—*Tool v. Norris, supra*. Every citizen is vitally interested in a pure administration of the affairs of government, and in order to attain this desired end, the law will not lend its aid to the enforcement of a contract between parties of a character which tends to tempt one or both to resort to sinister or improper influences to secure contracts from our government.—9 Cyc. 485; Greenhood on Public Policy, 363-4-5.

Improper influences are sometimes employed to secure government contracts, and occasionally, in awarding them, willing ears are lent to corrupt propositions, and when, by a contract between parties, a motive is disclosed to resort to improper means to secure contracts from the government, the only safe course to pursue is to meet the evil it suggests by striking it down from its inception. In the present case there is not the slightest suggestion that either party to the contract employed, or intended to employ, any improper means to carry out its terms; but it is of a nature where such means to effect its object might be employed, and that is sufficient to condemn it. The law adopts this prohibitory rule with respect to such contracts to prevent fraud, and remove temptation to commit it, without regard to whether fraud was contemplated or committed.

The law fixes the rate of compensation for legal advertising in newspapers at so much per each insertion.—Laws 1901, p. 179. The constitution requires that notices of proposed amendments to the constitution shall be published in not more than one newspaper of general circulation in each county for four successive weeks previous to the next general election for members of the general assembly.—§ 2, art. XIX. The contract which plaintiffs had was for publications which would be made but once a week. The contract which it was the purpose of the arrangement made by plaintiffs and defendant to secure for the defendant contemplated daily insertions, so that the latter would receive for the notices which the plaintiffs had contracted to publish more than six times as much as plaintiffs would have received, which was to be divided between them. In other words, plaintiffs, by surrendering their contract, would, if the defendant was awarded the contract to publish the notices which they had agreed to publish,

and published them, receive more than three times what they would had they published the same notices under their contract with the state. This was the inducement for the plaintiffs to surrender their contract with the state. The carrying out of this arrangement with the defendant by which this end was to be attained, was contingent upon their ability to induce the secretary of state to release them from their obligation. This contingency, in the circumstances of this case, invalidated the contract of defendant. It matters not that the parties entered into this agreement in good faith, or whether improper means were contemplated or employed to bring about the result which they intended by entering into it, or that the state was not a party, and was free to enforce the contract which it had made with plaintiffs, or could have selected some other paper in which to publish the notices of the proposed amendments. The fact remains that it was the intent of plaintiffs, through the contract which they now seek to enforce, to secure a sum of money from the state which they could not have obtained except by entering into, and carrying out, such contract. This result was dependent entirely upon a contingency of such a character that it offered a temptation to resort to improper means to bring it about. For this reason the tendency of the contract under consideration was evil, without reference to the question of whether fraud was intended by the parties or employed in its execution, or whether the state was, or was not, defrauded, and cannot be enforced.

The judgment of the district court is affirmed.

*Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE CAMPBELL concur.