## Bankers Bond Co. v. Buckingham, Commonwealth Treasurer, et al.

(Decided Oct. 23, 1936.)

RICHARD P. DIETZMAN for appellant.

B. M. VINCENT, Attorney General, and M. B. HOLIFIELD, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The part of section 4688a-2 of our present Statutes pertinent to this controversy says: "Whenever any warrant hereafter issued by the auditor of public accounts shall be presented to the treasurer for redemption, and the funds appropriated for the purpose for which said warrant was issued are exhausted, the treasurer shall endorse thereon the date of its presentation with the words, 'No funds with which to pay this warrant, and it bears five per cent [5%] interest from this date until called in,' with his official signature thereto, and such warrant shall thereafter bear interest at the rate of five per cent [5%] per annum, payable semi-annually." That language was first enacted in its present form by chapter 72, Acts of 1910, p. 217; it being section 3 of that act. The constitutionality of the authority thereby conferred was questioned in the case of Rhea v. Newman, 153 Ky. 604, 156 S. W. 154, 44 L. R. A. (N. S.) 989, but it was upheld. The doctrine of stare decisis renders that declared policy immune from successful attack, even if it should be insisted that the conclusion reached in the Rhea opinion was erroneous. But

there is no manifested disposition to do so, and it will not be referred to herein nor any discussion of the question made.

This litigation, while involving a question of wide and supreme importance to the general public of this commonwealth, involves but a simple and short transaction, and presents only three direct and narrow questions for determination. The facts upon which it is based and out of which it grew are these: Appellant and plaintiff below, Bankers Bond Company, is a corporation having the right to do the things set out below, with an office in the city of Louisville. Hon. John E. Buckingham, one of the appellees and a defendant below, is the duly elected and qualified treasurer of the commonwealth; whilst the other defendant below and appellee here, Buchannon-Lyon Company, is a commercial corporation with its chief office in the city of Louisville, Ky. It furnished material to the Welfare Department of the Commonwealth for the benefit of the Central State Hospital at Anchorage, Ky., the contract price of which was $500. It produced its certified claim to the auditor of public accounts, and he issued his warrant to the treasurer (Buckingham) for its payment. There were no funds in the budget, or otherwise available for the payment of the claim at the time defendant Buchannon-Lyon Company presented the auditor's warrant to the treasurer, and the latter agreed with the claimant to obtain an immediate purchaser for any warrant that he might issue for the amount of the claim, whereby the holder of it could obtain cash for its face value, provided the holder would agree for the warrant to be stamped as bearing only 3 per cent. interest. That proposition was agreed to, and its terms were thus stated in the endorsement on the back of the treasurer's warrant issued pursuant to the understanding: "Whereas, the commonwealth of Kentucky has no funds with which to pay this warrant, and whereas, the payee desires the face value in cash thereof immediately, therefore, in consideration of the Treasurer of Kentucky procuring an immediate purchaser of this warrant at par and the payment of the purchase price to the undersigned, the holder hereby assigns and transfers this warrant to ———, or bearer, and agrees that same shall bear interest at three per cent [3%] per annum only from this date until called for redemption or payment

according to law. This the —— day of ——, 19——." (Duly signed.)

On the same day of the issual of the warrant, and the signing of its inserted indorsement (through and by the efforts of the state treasurer), the plaintiff and appellant, Bankers Bond Company, agreed to and did purchase the treasurer's warrant so issued and stamped as bearing 3 per cent. interest, and the proceeds thereof were delivered to the payee, Buchannon-Lyon Company. There were six interest coupons attached to it and which was an innovation in the method heretofore pursued. However, they each contained language guarding against duplicate payments and expressly prescribing, in substance, that they ceased to be obligatory upon the payment of the warrant to which they were attached; the warrant, of course, having no fixed due date and conforming to the plan outlined in the 1910 act as approved in the Rhea opinion. On the same day, or within a short time thereafter, the appellant, as purchaser and assignee of the warrant, presented it to the state treasurer and demanded either the issual to it of a new one stamped as bearing 5 per cent. interest, or inserting that rate in the assigned one to it. Such action on its part was based upon its contentions that: (1) The inserted portion of section 4668a-2, supra, mandatorily required the stamping of such warrants (when their issue was permissible) as bearing 5 per cent. interest, and which was mandatory and was not subject to alteration, even by agreement of parties; (2) that if mistaken in contention (1), then there was no consideration for the agreed reduction of interest rate; and (3) that the attachment of coupons to the warrant was unauthorized and violative of the statute and rendered it wholly invalid. The treasurer declined to comply with that request, and plaintiff (assignee of the warrant) then filed this equity action against him in which it joined the original payee of the warrant as a defendant. In its petition it set out the facts as above recounted and prayed for mandatory process requiring the treasurer to comply with its request. There were filed with the petition copies of the warrant, the coupons attached to it, and the indorsement as set out supra, and all necessary exhibits to properly present the questions. Defendants demurred generally to the petition which the court sustained, and, plaintiff declining to plead fur-

ther, its petition was dismissed, to reverse which it prosecutes this appeal.

At the outset we deem it not improper to state that this is a friendly suit, but based upon actual facts, with no collusive coloring, in a bona fide effort to determine the questions raised on account of their supreme importance. There is, therefore, almost complete accord in arguments made by counsel representing the respective litigants; and which is to the effect that the arrangement outlined and pursued by the parties up to the time of the assignment of the warrant to plaintiff was legal in every respect and that the objections made by plaintiff were none of them meritorious. Our task is to determine whether such opinions of counsel, and that entertained also by the learned trial court as embodied in his judgment, are or are not correct. In discharging it we will consider and determine the questions in the order named.

1. That the requirement for the character of warrant here involved to be stamped as bearing interest at 5 per cent. is mandatory to the extent that it could not be made to bear a *higher* rate of interest is undoubtedly true, since to do so would allow contracting parties to set aside and annul the wholesome legislative public policy embodied in statutes against usury, which is the taking and accepting of interest over and above the rate fixed by law. No appending of authority is necessary in fortification of that statement. The question to be determined is therefore narrowed to the inquiry as to whether it is against public policy to agree to accept a rate of interest *less* than the enacted rate that might be demanded for the character of transaction involved? (which in this case is 5 per cent.). The text in 33 C. J. 219, sec. 97, in sustaining the right of the parties to the transaction to agree upon a contractual rate of interest says: "If the interest is intended as compensation for the use of money, and not as a penalty for nonpayment when due, there is no restriction as to the rate of interest for which the parties to a contract may stipulate, except such restriction as may be imposed by statute, or, according to some decisions, but not all, by the doctrine that the rate must not be so great as to be unconscionable. The *mere legislative naming* [without inhibitive language] of a rate does not bar a stipulation for a different rate, either less or greater." (Our italics.)

In stating the same principle, the text in 15 R. C. L. p. 20, sec. 18, says: "In general parties may make their own stipulations as to interest, limited only by the usury laws of the particular jurisdiction, and such stipulations once made a part of the writing of the obligation cannot then be varied by parol," etc. It is therefore clear that, since the agreement between the state treasurer and the payee of the warrant in this case did not violate our public policy against accepting usury, it was valid and competent for the parties to make, in the absence of some other invalidating reason, provided it was based upon a legally sufficient consideration which is to be hereafter considered in the discussion of contention (2), supra.

Assuming, therefore, that there was a valid consideration, it is then contended in furtherance of this objection that the agreement between the treasurer and the payee in the warrant for it to be stamped as bearing 3 per cent. interest was invalid because it violated a legislative declared public policy as embodied in section 4688a-2, supra, for the payment of interest on such warrants at the flat rate of 5 per cent., and that it is therefore incompetent for the parties to agree to charge and collect any *less* rate than that, and which is the kind of contract that is involved in this case. It is true, and which is conceded by all parties to this litigation, that an agreement contrary to public policy (whether legislatively or judicially declared) is vicious and void. No supporting authority is necessary for the universal acceptance of that proposition. It is therefore necessary to inquire whether the statute (section 4688a-2) was intended to prescribe a fixed and unalterable rate of interest with which such warrants might be stamped, and which should be paid to the holder thereof, even beyond the power of the parties to reduce by agreement, and for that granite rule to be followed regardless of change in conditions resulting in general reductions in rates of interest for loans or other obligations.

If the statute embodied any such public policy declaration, it was not expressly so stated and must be inserted therein through and by interpretation. As expressed, it plainly fixes only a *maximum* rate of interest, and which is 1 per cent. less than the prevailing maximum rate on all other character of obligations between private debtors and creditors, and perhaps pub-

lic debtors as well, although it is a well-settled principle that neither a state nor any subdivision thereof may be held to the payment of interest on their public debts "unless bound by an act of the legislature or by a lawful contract of its executive officers made within the scope of their duly constituted authority. * * * The theory upon which the rule is based is that whenever interest is allowed either by statute or by common law, except in cases where there has been a contract to pay interest, it is allowed for delay or default of the debtor. But delay or default cannot be attributed to the government. It is presumed to be always ready to pay what it owes. The apparently favored position of the government in this respect has been declared to be demanded by public policy." 15 R. C. L. 17, sec. 14. It therefore follows that the act under consideration (section 4688a-2) embodies a consent on the part of our Legislature to pay as much as 5 per cent. on its treasury warrants, with the necessary implication that it did not consent to pay a *higher* rate, and which had the effect to prohibit and render void any arrangement, contractual or otherwise, whereby it would be called upon to pay a rate greater than the one to which it had so consented. Such implied inhibition was a public policy declaration against paying any contractual rate of interest in excess of the statutory rate of 5 per cent. But it by no means follows therefrom that the reverse conclusion is imperatively demanded whereby it was also the intention of the Legislature to take away the right of the parties to agree and contract for a *lesser* rate of interest than that contained in the statute, and which was done in this case by the arrangement herein attacked.

The term "public policy" is, perhaps, the most expansive and widely comprehensive phrase known to the law, and in Gordon v. Gordon's Adm'r, 168 Ky. 409, 182 S. W. 220, 221, L. R. A. 1916D, 576, Ann. Cas. 1917D, 886, it is said that: "It is probable that a satisfactory or precise definition of public policy has never been given." See Caldwell's Kentucky Judicial Dictionary, vol. 6, p. 2249. Likewise, it was said in the same opinion that: "The courts have, however, frequently approved Lord Brougham's definition of public policy as the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare." We had previously said in the case of Ballard County Bank's Assignee et al. v. United States

Fidelity & Guaranty Co., 150 Ky. 236, 150 S. W. 1, 2, Ann. Cas. 1914C, 1208, that, as applied to contract rights, "public policy is usually understood to be 'the principles under which the freedom of contract and private dealing is restricted by law for the good of the community.' Thus certain classes of acts are said to be 'against public policy,' and the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interests of the state, apart from illegality or immorality. Holt v. Thurman, 111 Ky. 84, 63 S. W. 280, 23 Ky. Law Rep. 92, 98 Am. St. Rep. 399."

Mr. Greenhood, in his excellent work on Public Policy in the Law of Contracts, on page 2 thereof, says: "By 'public policy' is intended that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be termed the policy of the law, or public policy in relation to the administration of the law." We thus see that, as applied to contract rights, public policy is not invaded unless there lurks in the contract "a mischievous tendency so as to be injurious to the interest of the state," when applied to a contract to which the state, through any of its duly constituted agencies, becomes a party. Likewise, a private contract might also invade public policy when there lurks in its terms the same tendency. Confining ourselves to the case in hand, it becomes unnecessary to enter into the wide field covered by the term "public policy" any more than to ascertain what is embraced by that doctrine—howsoever it may be declared or originated—as applied to the right to contract.

Having said this much, we will now briefly turn our attention to the statute involved (4688a-2) to see whether there are any *implied* provisions in it whereby the Legislature intended to declare that an agreement for the stamping of treasury warrants, bearing a rate of interest *less* than 5 per cent. would hamper the good of the community or would "have a mischievous tendency, so as to be injurious to the interest of the state"; or, as Mr. Greenhood puts it, whether or not such an agreement for a lower rate of interest would have "a tendency to be injurious to the public or against the public good." As we have seen, there is no such express declaration in the statute, but in whatever manner expressed, the legislative declaration would no doubt be

obligatory on us were it therein contained, since the Legislature by its statutory declarations is supreme in the adoption of what may be the state's public policy on a particular question. The question then is further narrowed to the point of whether we are authorized to infer that the Legislature in enacting the statute inhibited "by necessary implication" the doing of what would otherwise be a perfectly legitimate transaction, universally engaged in and universally approved (as we have hereinbefore shown), and to thereby prescribe that a contract possessing no mischievous tendency, but on the other hand possessing consequences of vast benefit to the state, should be held to invade public policy as applicable to contractual rights? We have read and reread with great care the involved statute, and fail to find anything in it from which such implied inhibition could be inferred, and especially is that true when to do so would convict the Legislature of forbidding the state to contract with those having claims against it so as to save the taxpayers of the commonwealth vast sums of money each year, and that, too, when the alleged forbidden contract is of the nature and kind universally approved and upheld (i. e., for a less rate of interest than the legal rate), and invades no public policy of the state, except for the alleged implied inhibition. We do not feel authorized to adopt any such conclusion, and therefore hold that it was legally competent for the parties to enter into the transaction here involved, provided it was based upon a sufficient consideration, if indeed an independent one were necessary, and which brings us to a discussion of contention (2), supra.

2. Our determination of contention (1) also virtually answers the second one adversely to appellant. We so state because if it is competent for the parties to contract for a less rate of interest than that contained in the statute (which we have held was true), then there exists nothing to prevent an applicant for a treasurer's warrant from entering into a binding obligation to accept one bearing a lower rate of interest—just as a lender of money in a private commercial transaction may agree to accept a less rate of interest than 6 per cent. which is the maximum legal rate in this jurisdiction. But if an independent consideration were required, then we conclude that the agreement in this case was based upon a sufficient and valid one as embodied in the indorsement appearing on the back of the war-

rant, which we have hereinbefore inserted. The holder of the warrant might (and it is so stated in the indorsement upon the warrant here involved) require the immediate cash for his claim and be unwilling, as well as financially unable, to carry it at *any* rate of interest. In order to induce the treasurer to obtain the immediate cash (as the word "immediate" is legally defined), the claimant agrees for his warrant to be stamped as bearing only 3 per cent.

The law books are bulging with definitions of what is a lawful consideration for agreements and contracts, but for the purposes of this case it will be sufficient to adopt the one given in our opinion rendered in the case of McDevitt v. Stokes, 174 Ky. 515, 192 S. W. 681, 682, L. R. A. 1917D, 1100, in which it is stated that: "Consideration, however, need not be the payment of money. It may consist in some right, interest, profit, or benefit accruing to one party or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other; provided, however, the benefit conferred or detriment suffered is deemed of value in the eye of the law." See, also, Spears & Sons v. Winkle, 186 Ky. 58, 587, 217 S. W. 691, and numerous other cases appearing in volume 4 of Caldwell's Kentucky Judicial Dictionary, p. 551 et seq.

Here, the payee in the warrant (Buchannon-Lyon Company) before it was issued informed the treasurer of its urgent necessities for the immediate payment of the face of its claim or the par value of the warrant in cash, and that in consideration of the treasurer procuring for it the cash through the obtention of a purchaser of the warrant the reduced rate of interest would be acceptable. That arrangement was carried out according to its terms, and the warrant when transferred to plaintiff bore on its face a rate of interest of only 3 per cent. It is quite possible that, even if that rate would not be binding on the original payee, the plaintiff, as transferee with full knowledge of the agreed rate, nevertheless might be estopped to question the transaction; but we have preferred to put aside that question and to base our opinion upon the legality of the transaction ab initio.

3. Lastly, it is contended in support of contention (3) that the attachment of the coupons to the warrant rendered the whole transaction illegal and void. Nobody

seems to be serious in making that contention, and neither are we so impressed with it. The coupons were so attached, as clearly and indisputably appears, only for the purposes of convenience and economy. Under the law, holders of warrants have to send them to the treasurer in order to collect their semiannual installments of interest, and sometimes they are held in such quantities as that transportation charge (by mail or otherwise) amounts to a considerable sum; besides they being subjected to the possible hazard of loss. To circumvent such objections and to render the collection of the semiannual installments of interest less expensive and more convenient, the treasurer devised the plan of attaching to the warrant a limited number of coupons containing the guarding language to which we have referred and which cannot and will not operate to the detriment of the state in any particular whatever, nor does it, in the circumstances outlined, render it any more possible for the state to be defrauded or create any increased opportunity to produce duplicate payments of interest installments. More extended elaboration of the question appears to be unnecessary, except to add that we have strictly confined this opinion to the questions raised by this record, leaving undetermined others that might arise through an effort on the part of the treasurer to issue substitute warrants for all outstanding ones, though of the identical nature and tenor, and bearing a lower rate of interest, and with the proceeds arising from the sale thereof take up a corresponding amount of outstanding warrants, bearing 5 per cent. interest. No such question is presented, and no conclusion as to the existence or nonexistence of any such authority on the part of the treasurer is intimated.

For the reasons stated, the judgment is affirmed.

The whole court sitting.