THOMAS B. LILLY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HELEN W. LILLY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 18881, 18882. Promulgated June 6, 1950.

*Richard E. Thigpen, Esq., Arthur M. Jenkins, Esq., Claude C. Pierce, Jr., Esq.,* and *Charles S. Lowrimore, C. P. A.,* for the petitioners. *James C. Maddox, Esq.,* for the respondent.

1070

OPINION.

LEECH, *Judge*: The first issue presents the propriety of the deduction of $2,250 by petitioner Thomas B. Lilly, for the year 1942, as a bonus paid in that year by him to W. H. Lightfoot, who had been, since 1939, the manager of the Greensboro branch of the City Optical Co. This deduction was disallowed by respondent upon the ground that there was insufficient evidence to establish that it was in fact a bonus paid for services rendered. There is no dispute as to the fact that the payment was made to and received by W. H. Lightfoot.

The evidence in the record upon this item is uncontroverted. Lightfoot is shown to have been a valued employee, in charge of the Greensboro branch of the City Optical Co. since 1939. He had been assured by petitioner Thomas B. Lilly that if the operation of that branch were successful he would be paid a bonus in addition to his regular salary. No specific amount was agreed upon but, in 1942, the matter was brought up and, the operations of the Greensboro

branch having been successful, the amount of $2,250 as a bonus for prior service was fixed by petitioner Thomas B. Lilly, accepted by Lightfoot, and paid in that year. We hold that such amount is properly deductible in determining the net income of petitioner Thomas B. Lilly for the year 1942.

The second issue is whether the entire net income of the business operated as a partnership under the names of the City Optical Co. and Richmond Optical Co. is taxable in the years 1943 and 1944 to petitioner Thomas B. Lilly.

Respondent's contention is that the business operated in those years as a partnership composed of Thomas B. Lilly and his wife, Helen W. Lilly, was not in fact a partnership recognizable for income tax purposes. We do not agree.

The testimony and demeanor of petitioner Helen W. Lilly on the stand show to our satisfaction that she is and was during the taxable years a woman of force and intelligence. Before her marriage in 1937 to Thomas B. Lilly, she had taught school for some years. She had acquired business experience as assistant buyer for a department store in Richmond, Virginia. Prior to her marriage she had been acutely interested for many years in the care and treatment of the eyes. Following her marriage she took an active interest in the business of the City Optical Co. operated by her husband, performing active and substantial services for the business and familiarizing herself with the manner and needs of its operation. She made trips to the various branches of the business in other cities, inspecting the operation of these branches and, with this background, gave substantial assistance in resolving problems arising therein.

After several years spent in giving this assistance to the business, she approached her husband with the request that she be permitted to acquire a personal interest in the business. As a result of discussions of this question, a written contract was made between the two petitioners under which Thomas B. Lilly conveyed to his wife a 49 per cent interest in the business at its net book value, she giving him her interest-bearing note for the amount of the purchase price. At this time she had some estate of her own, acquired in her work prior to marriage and through intermittent gifts from her husband.

Immediately following the conveyance to Helen W. Lilly of the 49 per cent interest in the business, she and her husband entered into a written agreement of partnership under which she was given equal rights of management and in control of the business and its funds. The business was thereupon duly recorded under state law as a partnership between these two individuals, and the banks were notified of this fact and of Helen W. Lilly's right to draw checks against deposits by the business.

Following the organization of the parnership, Helen W. Lilly continued to devote her time and services to the business and to exercise fully her rights under the parnership agreement. She signed notes and agrements binding the partnership, and drew checks upon its bank accounts both in payment of its bills and for withdrawals of funds for her personal use and investment. She actively participated equally with her husband in the management and operation of the business.

On August 9, 1945, petitioner Helen W. Lilly borrowed the sum of $35,000 from a Wilmington, North Carolina, bank upon her personal unsecured note. With this loan and other funds of hers, she then paid in full the note of $37,333.75 which she had given her husband upon the acquisition of the 49 per cent interest in the business, together with interest on the note of $2,921.36, this item of interest being reported by her husband in his 1945 income tax return.

The respondent relies upon *Commissioner* v. *Tower*, 327 U. S. 280, and *Lusthaus* v. *Commissioner*, 327 U. S. 293. The rule laid down in those cases was clarified by the decision in *Commissioner* v. *Culbertson*, 337 U. S. 733. In that case the Court said:

* * * The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the *Tower* case, but whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

Here the wife actively participated in a substantial way in the operation of the business prior to the formation of the partnership, and actively participated on an equal basis with her husband in the business operations after its formation. It is true that the wife acquired the 49 per cent interest in the business from her husband with her interest-bearing note, but this note was paid, together with interest, with funds of the wife which included her relatively substantial savings prior to her marriage and funds given intermittently to her by her husband, Thomas B. Lilly, prior to this time, and belonging to her, and a personal loan secured by her from a bank upon her unsecured note. It is true that the record indicates that the bank loan personally secured by the wife was paid off in later years by her largely from her withdrawals from her share of earnings of the business subsequent to the formation of the partnership. This fact, alone, however, does not negative a genuine intention on the part of the two petitioners to carry on business in partnership. Cf. *Western Construction Co.*, 14 T. C. 453.

We find a real intention on the part of the two petitioners in the

organization of the partnership to carry on the business as a partnership, and following its organization it was carried on as such. We hold that the earnings of the business are taxable to the two petitioners here in the proportion provided by the partnership agreement. *Lawton* v. *Commissioner*, 164 Fed. (2d) 380; *Singletary* v. *Commissioner*, 155 Fed. (2d) 207; *John A. Morris*, 13 T. C. 1020; *Zygmunt Matuszewski*, 13 T. C. 738; *N. B. Drew*, 12 T. C. 5; *Paul L. Kuzmick*, 11 T. C. 288; *David L. Jennings*, 10 T. C. 505; *Sinne B. Forsythe*, 10 T. C. 417; *Samuel Goodman*, 6 T. C. 987; *Leo Marks*, 6 T. C. 659.

The third issue, as to whether the entire net income of a business operated in the taxable year under the name of Duke Optical Co. was taxable to Thomas B. Lilly, is in effect decided against respondent by our finding upon the preceding issue. Petitioner Thomas B. Lilly had taken over the business and assets of the Duke Optical Co. upon its liquidation, at approximately their net book value, as a credit against an indebtedness to him in a larger amount. These assets were acquired by Helen W. Lilly from her husband at the same value, she giving him her promissory note in that amount. This business was thereafter operated successfully by Helen W. Lilly for two years through a local manager controlled and supervised by her. During this period the net asset value of the business was more than doubled through contributions to its capital account by Helen W. Lilly from her own funds. After two years of operation, Helen W. Lilly conveyed a 51 per cent interest in the business to her husband, the consideration being the satisfaction of her promissory note and interest thereon, given to him upon the acquisition of the original assets two years before.

Respondent contends that these advances by Helen W. Lilly were from funds withdrawn by her from the 49 per cent interest in the City Optical Co. standing in her name and which consequently must be considered as funds of Thomas B. Lilly. On this basis it is argued that the purchase of the Duke Optical Co. assets from Thomas B. Lilly by his wife was not a bona fide transaction and there were in fact no advances to the business by petitioner Helen W. Lilly. On our decision of the prior issue, it must be concluded that the additional funds paid into the capital account of the Duke Optical Co. were from the personal funds of Helen W. Lilly, and there was, accordingly, an actual consideration paid by her for the cancellation of her note originally given to her husband for the assets.

We think the evidence clearly shows that during the two years here in question, Helen W. Lilly, in fact, owned and operated individually the business known as the Duke Optical Co. and that she was taxable upon all of the income of that company for those periods.

The fourth issue presents the correctness of the disallowance of deductions of certain so-called trade discounts in computing the income of the City Optical Co. and the Duke Optical Co. All of these items in each year were composed of payments made by these companies to various physicians who were oculists. These payments constituted one-third of the amount these optical businesses charged customers for the grinding of lenses and the fitting of eyeglasses under prescriptions issued by those doctors. The circumstances with respect to such payments are set out in our findings of fact.

These payments for each of the taxable years have been disallowed by the respondent on the grounds that they were made under contracts which were void and unenforceable as against public policy and consequently are not deductible as ordinary and necessary expenses.

If the payments which are the subject of the present controversy were merely remotely connected with contracts violating public policy—such as fees of attorneys paid in litigation brought to determine the question of that violation—then such payments are deductible. But if these payments were directly connected with contracts contravening the alleged public policy here—payments or the promise to make which were the very consideration for such contracts—they are not deductible as ordinary and necessary expenses. *Commissioner* v. *Heininger*, 320 U. S. 467, and cases cited therein. No question is and we think none could reasonably be raised here but that the payments involved were directly connected with the contracts between the physicians and the opticians, petitioners. Petitioners' position is simply that no public policy was violated by these contracts.

Here an individual who is suffering from eye trouble employs an oculist to render professional services in the relief of that trouble. Implicit in this contract is the provision that the physician shall use his full ability and professional skill toward the patient. *Ballou* v. *Prescott*, 64 Me. 305. These services include an examination and, if necessary, treatment, such as the use of glasses as prescribed by the doctor. To the patient the oculist stands in a position of the highest trust and confidence, and his advice and suggestions are customarily followed because of this status. The oculist examines the patient's eyes, measures the vision, and writes a prescription for the grinding of the necessary lenses to correct the defect in sight. For this the oculist makes a charge, payment of which meets the only obligation of the patient to the oculist for the services rendered to him by the oculist, including the later service of an inspection of the quality of work in the glasses, a check of them by the oculist against his prescription, and causing their return to the optician for correction where necessary without additional charge by the optician.

The oculist recommends or suggests to the patient that the prescription be taken to one or more designated opticians for the work of

grinding the lenses in accordance with the prescription and furnishing and fitting frames therefor.   The patient is not required to go to such opticians, but in the vast majority of cases he takes the advice or suggestion of the physician, oculist, because of his trust and confidence in him.

The evidence is that certain oculists had an arrangement or understanding with the City Optical Co. and the Duke Optical Co., to which companies they directed their patients, that a substantial portion of the charge exacted from the patient for work done by these opticians be remitted to such oculists.   The amount of the charge remitted to the oculist by the opticians here was one-third of the amount paid by the patient to the optician for services rendered to the patient by the optician that the patient employed.

Explanations by various oculists who testified in this proceeding and by officers and employees of the City Optical Co., as tending to justify the propriety of this arrangement, are anything but convincing.   By some, it was stated that the optician was considered as an agent or employee of the oculist.   There is, of course, no sound or even reasonable basis for such statement.   The particular optician was selected by the patient, who was free to make any selection.

Others testified that the amount of the "kick-back" to the oculist was his additional compensation from the optician for examining the glasses, if the patient returns to him, to learn whether the prescription has been properly filled and to cause the glasses to be returned to the optician for correction without further charge by him. .  Such service by the oculist, however, is included in that for which he has been paid by his patient and is performed by the oculist in all cases if requested by the patient, whether the prescription for glasses has been filled by the optician with whom the oculist has an arrangement for division of fees or by one with whom no such arrangement exists.

A third explanation offered was that, in the absence of such an arrangement, an oculist might "dispense" the glasses for which he prescribed lenses.   In such circumstances the oculist would not only prescribe the lenses, but would have the patient select the type of frames he desired, measure his face for the size of frame necessary, and order the complete glasses, including the ground lenses fitted into the frames, from some optician employed by this oculist.   He would then make an aggregate charge to the patient covering the prescription, glasses, and a charge for fitting them when returned by the optician.   It was testified that, under those circumstances, it was customary for the oculist to charge his patient a retail price for the ground lenses and frames, while he paid the optician the wholesale price, thus making an additional profit over and above that included in his charge for his prescription.

It is explained that the surrender by the oculist of the profit he would thus make, if he personally bought the lenses and frames and fitted the glasses, is the consideration for and entitles him to receive a portion of the profit derived by the optician for that service. This explanation is also without basis in fact. The employment by the patient of an optician to perform the service in question relieves the oculist not only of the work of fitting and adjusting glasses, but also of the burden of financing their manufacture and thus eliminates the possibility of loss to the oculist through the patient's failing to pay for the glasses.

Are these contracts against public policy?

Public policy is defined as the public good. Everything that tends clearly to undermine that sense of security of individual rights, whether of personal liberty or private property, which any citizen ought to feel, is against public policy. *Maryland Trust Co.* v. *National Mechanics' Bank*, 102 Md. 608; 63 Atl. 70; *Goodyear* v. *Brown*, 155 Pa. 514; 26 Atl. 665; *Russell* v. *Courier Printing & Publishing Co.*, 43 Colo. 321; 95 Pac. 936; *Boston & A. R. Co.* v. *Mercantile Trust & Deposit Co.*, 82 Md. 535; 34 Atl. 778. As the court said in *Elzey* v. *Ajax Heating Co.*, 10 N. J. Misc. Rep. 281; 158 Atl. 851:

Contracts, the objects of which are regarded by common law as contrary to "public policy," are unenforceable at law.

"Public policy" has been defined as being that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be designated, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law."

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Thus a contract between a layman and a lawyer by which the former agrees, in consideration of a division of fees received by the latter, to seek and bring to the attorney persons having causes of action against railroad companies for personal injuries, is contrary to public policy and void. *Holland* v. *Sheehan*, 108 Minn. 362; 122 N. W. 1.

It has been held that public policy is the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like; it is that general and well settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation. *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Kinney*, 95 Ohio St. 64; 115 N. E. 505.

It has also been said that many things which the law does not prohibit in the sense of attaching penalties to punish their commission can not be admitted as the subject of a valid contract if they are so mischievous in their nature that to permit them to be the subject

matter of a contract would be violative of public policy under the principle that no one can lawfully do that which has a tendency to be injurious to the public welfare. *Gordon* v. *Gordon's Administrator*, 168 Ky. 409; 182 S. W. 220; *Bankers Bond Co.* v. *Buckingham*, 265 Ky. 712; 97 S. W. (2d) 596.

Petitioners argue that, since there is no constitutional or statutory provision, state or Federal, and no canon of ethics of a medical association specifically condemning this "kick-back" practice by opticians to oculists, no public policy exists proscribing such practice and therefore none is violated.

True, we have found no such constitutional or statutory provision. All the witnesses who were asked the question denied knowledge of any condemnatory specific canon of ethics, although the practice had been criticized and condemned at meetings of the medical associations and in their professional publications. But is that the answer? We think not.

The absence of constitutional or statutory law or rules of professional conduct condemning this particular practice is not enough to support petitioners' position. Decisions of the courts can and do evidence public policy. *Vidal* v. *Girard's Executors*, 2 How. 127. The rule of law which the contracts between the oculists and the petitioners violate has long ago become a fixture in the law by innumerable decisions which supply the "definite indications in the law of the sovereignty" justifying the invalidation of these contracts as contrary to the policy thus indicated. See *Muschany* v. *United States*, 324 U. S. 49. That rule of law is that one can not, at the same time, serve two incompatible masters. And actual damage is not a condition precedent to the application of the rule. Judge Lurton, while speaking for the United States Court of Appeals for the Sixth Circuit in *City of Findlay* v. *Pertz*, 66 Fed., at page 434, stated the rule as follows:

Any agreement or understanding between one principal and the agent of another, by which such agent is to receive a commission or reward if he will use his influence with his principal to induce a contract, or enter into a contract for his principal, is pernicious and corrupt, and cannot be enforced at law. This principle is founded upon the plainest principles of reason and morality, and has been sanctioned by the courts in innumerable cases. "It has its foundation in the very constitution of our nature," says Judge Dillon, "for it has authoritatively been declared that a man cannot serve two masters, and is recognized and enforced wherever a well-regulated system of jurisprudence prevails." 1 Dill. Mun. Corp. § 444. "An agent cannot be allowed to put himself in a position in which his interest and his duty will be in conflict." Leake, Cont. (3d Ed.) 409. The tendency of such agreement is to corrupt the fidelity of the agent, and is a fraud upon his principal, and is not enforceable, "even though it does not induce the agent to act corruptly." "It would be most mischievous to hold that a man could come into a court of law to enforce such a bargain on the ground that he was not in fact corrupted. It is quite immaterial that the employer was not damaged." Wald's Pol. Cont. 245, 246, note; citing *Harrington* v. *Dock Co.*,

3 Q. B. Div. 549, and other cases. *Taussig* v. *Hart*, 58 N. Y. 425; *United States Rolling-Stock Co.* v. *Atlantic & G. W. R. Co.*, 34 Ohio St., 450–460; *Smith* v. *Sorby*, 3 Q. B. Div. 552; *Young* v. *Hughes*, 32 N. J. Eq. 372; *Yeoman* v. *Lasley*, 40 Ohio St. 190. * * *

Other judicial expressions of the rule are:

One employed by another to transact business for him, has no right to enter into a contract with a third person, which would place it in his power to wrong his principal in the transaction of the business of the latter, and which would tempt a bad man to act in bad faith toward his employer. * * * His compensation could be increased by such conduct, and it is no answer, that nothing of the kind occurred. [*Atlee* v. *Fink*, 75 Mo. 100.]

* * * One who is intrusted with the interest of others cannot be allowed to make the business an object of interest to himself. Such transactions are against the policy of the law. [*Rezos* v. *Zahm & Nagel Co.*, 78 Cal. App. 728; 246 Pac. 564, 565.]

It makes no difference that such common agent was guilty of no actual wrong. The courts refuse to countenance such an employment, not for the sake of the principals, but for the sake of the law. [*Chapman* v. *Currie*, 51 Mo. App. 40.]

It is immaterial that the plaintiff acted in good faith, or that the defendant suffered no damage. It is the policy of the law to remove all temptation in an agent to be influenced by his own interest to the detriment of his principal. [*Humphrey* v. *Eddy Transportation Co.*, 107 Mich. 163; 65 N. W. 13.]

See also *Oscanyan* v. *Arms Co.*, 103 U. S. 261; *Tool Co.* v. *Norris*, 2 Wall. 45; *Easton Tractor & Equipment Co.*, 35 B. T. A. 189; *Quinn* v. *Burton*, 195 Mass. 277; 81 N. E. 257; *Smith* v. *David B. Crockett Co.*, 85 Conn. 282; 82 Atl. 569; *Jensen* v. *Bowen*, 37 N. D. 352; 164 N. W. 4.

This rule has been recognized and applied by this Court. Not only is that true, but it has been extended to cover a case where the proscribed contract was made not by the principal with the agent or employee of another principal, but by one principal with an intimate friend and associate of the agent or employee of the other. Thus in *Easton Tractor & Equipment Co., supra*, the petitioner sought to deduct, as ordinary and necessary expenses of its business of selling road equipment, commissions paid to a person, not a public official, who was a friend and associate of members of the State Highway Commission, who were agents and employees of the state in the purchasing of such equipment. We denied the deduction on the ground that the contract under which it was paid was against public policy.

In this case, as in others cited, the agent or employee involved was that of a government or its instrumentality. But the rule is applied generally to situations where the parties are private individuals or corporations. *Maryland Trust Co.* v. *National Mechanics' Bank, supra; Wolfe* v. *International Re-Insurance Corporation*, 73 Fed. (2d) 267; certiorari denied, 294 U. S. 725.[1] See also *United States* v. *Carter*, 217 U. S. 286.

[1] In neither the *Wolfe* nor the *Beekman* case did the decision rest on the violation of any statute.

In the *Wolfe* case the plaintiff, a public accountant, was employed by both the United States Casualty Co. and the defendant corporation to make their annual audits. In connection with his audit of the United States Casualty Co. he called attention of its president to the amount of its outstanding risks as being too high and recommended the reinsurance of a portion of them with the defendant. Unknown to United States Casualty Co., Wolfe had an agreement with the defendant for the latter to pay him a commission on all business United States Casualty Co. should reinsure with it. Wolfe drafted for the latter company a reinsurance contract and participated in the conference between the two companies, as a result of which it was adopted. In holding the contract between Wolfe and defendant void and unenforceable, Judge Learned Hand, for the Circuit Court of Appeals of the Second Circuit, said the contract "made impossible that unmixed allegiance on which the law insists."

In *Reilly* v. *Beekman*, 24 Fed. (2d) 791, the facts were these. Reilly was an accepted business and financial adviser to one Mrs. Trenkman, and as such occupied a position of trust and confidence. Mrs. Trenkman had a business matter involving her father's estate and Reilly advised her to employ Beekman, a lawyer, to represent her. Reilly introduced Beekman to her, as a result of which Beekman was employed. Unknown to Mrs. Trenkman, Reilly had an agreement with Beekman under which he was to receive 50 per cent of any fee received by Beekman on business which Reilly might be able to direct to him. Beekman received from Mrs. Trenkman a fee of $600,000 for his services to her. Reilly sued Beekman for the percentage due him under their contract. In denying relief on the ground that the contract between Reilly and Beekman was void as against public policy, the Second Circuit, speaking through Judge Augustus N. Hand, said:

It cannot be disputed that, if Reilly was in a fiduciary relation to Mrs. Trenkman when he recommended Beekman to her as an attorney, he could not agree to profit from the business arising out of the introduction without her knowledge and consent. This is because Mrs. Trenkman was entitled to his disinterested advice as to the attorney to be recommended to her. That advice was not likely to be disinterested, if affected by the consideration of whether or not he could make a profit out of the recommendation of a particular person. Moreover, she was entitled to have him recommend an attorney, the amount of whose fees would depend on the services he had to perform, and would not be affected by what he had to pay out to the plaintiff for an introduction to the client. * * *

The court said further:

* * * If, as is contended, Reilly was not acting in an ordinary sense as an agent for Mrs. Trenkman in respect to her business and financial affairs, and simply as a friend recommended a lawyer, when requested so to do, we think he stands in no better position To be sure, in that case he would be only a volun-

teer; but if he offered merely as a friend to recommend an attorney, with no knowledge on her part that he was to derive any benefit from the recommendation, she was deprived of the disinterested advice which he assumed to give when he was *under the pay of Beekman in making the recommendation.*

\* \* \* In such circumstances the law regards the contract on which recovery is sought as unenforceable, because *against public policy.* \* \* \* [Emphasis supplied.]

It is not contended by the petitioners, nor did any witness testify, that the aggregate fees of the oculist and the optician or even the cost of glasses to a patient was less or no more under the above "kick-back" arrangement than it would have been in its absence. It is clear to us that the practice tended to increase that cost. The oculist, of course, knew of his contract with the optician when each patient was examined. The patient, in practically all cases, knew nothing of the arrangement. Thus, the oculist, in a relationship of great trust and confidence with respect to the patient, is subjected to the temptation of prescribing glasses where not actually necessary, or more expensive lenses than those really needed.

It may be argued, however, that such rule is not applicable on the present facts for the reason that the contract of employment between the oculists and their patients ceased with the issuance of the prescription for glasses to the patient and, therefore, did not include any recommendation of an optician by the oculist. We disagree.

The patient employed the physician, oculist, to use his full professional care, ability, and skill in attempting to cure or relieve the patient's eye trouble. *Ballou* v. *Prescott, supra.* Under the express terms of this contract these services did not terminate until *after* the patient received his glasses from the optician, when, if requested by the patient, the doctor was required to inspect and check them against his prescription. Thus, we think, the contract of the doctor with the patient included the full use of his professional skill, ability, and care in providing a proper grinding of the necessary lenses as prescribed by the doctor, which, in turn, comprehended—*at least when made as here*—recommendations as to the optician the patient should employ. See *Reilly* v. *Beekman, supra; Schmit* v. *Esser,* 183 Minn. 354; 236 N. W. 622. To the same effect are *Gillette* v. *Tucker,* 67 Ohio St. 106; 65 N. E. 865; *Nash* v. *Royster,* 189 N. C. 408; 127 S. E. 356.

Although the pertinent rule or policy of the law, as has been stated, is a fixture in the law, we have found no case where it has been applied to the present facts. This is understandable. The two apparent ways in which the question could arise on these facts would be where a physician was suing on such a contract or where, as here, the optician attempts to deduct his payments under such contract as ordinary and necessary expenses of his business for tax purposes. In the first case it is improbable that any sensible doctor would sue and thus allow the

attendant publicity of his lack of professional honesty to lose him more than the money involved. In the latter case, if the payments by the opticians to the doctors were camouflaged as here, under the inaccurate designation of "trade discounts," it would be at least difficult for the tax collecting agency to discover such payments.

Nevertheless, we think the answer is clear. So far as this record reveals, all the contracts under which these "kick-backs" were paid were made by petitioners with physicians. We think petitioners knew that fact and realized the very high degree of trust and confidence existing between those doctors and their patients. We think petitioners realized that because of that relationship the patients would follow the recommendation of the optician by the doctor, as they did, and that these considerations were what inspired the petitioners, opticians, to make these contracts and the payments, the deduction of which is in controversy. It may be noted further that these contracts were oral—so far as here disclosed; that the payments to some of the oculists were made in cash at their request and, significantly, all such payments were recorded in the books of petitioners under an account labeled "trade discounts"—an account which obviously, to say the least, did not correctly describe them. To which may still be added the fact that one of the two opticians in Greensboro, North Carolina, where this case was heard, has ceased this "kick-back" practice since the tax years involved here.

If we accept the contract between the doctor and the optician on its face, it would seem that the payments thereunder to the doctor were merely commissions on the sale of lenses and frames of the optician to the patient of the doctor. On this basis the doctor, unknown to the patient, is accepting a payment from the optician for recommending the optician—a service which is included in the employment of the doctor by the patient and for which the doctor has been paid by the patient. But some of the doctors testifying insisted the payments they received from the opticians, unknown to the patient, were additional compensation for the services to be rendered to their patients in checking and inspecting the glasses after their delivery to the patients. It is not disputed, however, that this check and inspection of the glasses purchased from the optician on the recommendation of the doctor were included in the employment of the doctor by the patient for which the patient had paid the doctor. Nor is it to be questioned that, under his contract of employment by the patient, it was the duty of the doctor, where necessary—*after* this inspection of the glasses—to direct their return for correction to the optician whose contract with the patient required the optician to do this additional work on the glasses without additional charge.

Thus under either premise—and approaching the question from the viewpoint of either the physician or the optician—the contracts between them violated the rule of public policy above discussed. *Wolfe v. International Re-Insurance Corporation, supra; Reilly v. Beekman, supra; Easton Tractor & Equipment Co., supra; Kelley-Dempsey & Co.*, 31 B. T. A. 351. In the last cited case a contractor doing work for a principal agreed to pay agents of that principal who were employed in inspecting and approving the work to see that the contractor received that to which he was entitled under the contract. In that case there was no indication that the principal was actually defrauded or that the inspection was other than honest and fair. No indication of any intention to corrupt the agent and induce him to approve work improperly done appears. There, however, we characterized such a payment as one by which the contractor "greased some palms," and denied the deduction of the payments thus made by the contractor as not ordinary and necessary business expenses.

It is true that the evidence in this case is that the practice questioned here was more prevalent than that condemned in the *Kelley-Dempsey* case. But the fact that more people "greased [more] palms" here than in the *Kelley-Dempsey* case, whatever its other effects are, surely does not make of such practice anything other than a greasing of palms. We continue to hold, as we did in the *Kelley-Dempsey* case, that:

> * * * to encourage the accession to demands of this sort, both morally and legally wrongful, by straining the common meaning of the words of the statute to permit such payments to be deducted as ordinary and necessary expenses of operating a business would be poor public policy. This Board and the Courts have consistently refused to do so with respect to expenditures occasioned by somewhat comparable causes.[2] [Footnote 2, citing cases.]

It must be remembered that the fundamental principle with which we are dealing here is not that of the relationship between the parties to an ordinary commercial transaction. We are concerned in this case with the relationship between physicians and their patients. There can be no doubt of the exceedingly high degree of confidence and trust inherent in that relationship.

As the court, in a recent exhaustive and illuminative discussion of that relationship, said in *Bartron v. Codington County*, 68 S. D. 309; 2 N. W. (2d) 337:

> These professions, as they exist in our social structure, rest upon a foundation of sturdy, sterling human character which, in turn, has been and is being shaped and moulded by the impact of traditional ideals and points of view. The licensing statutes with their emphasis on character and professional conduct evidence a fixed public desire and will not only to foster, but to develop and reinforce, these basic attributes of its professional servants. The constant trend of public

demand, as exhibited by these licensing statutes, is for mounting standards, a more painstaking investigation of the character and professional conduct of applicants for entrance into those regulated fields, and a more constant vigilance in observing the conduct of those to whom the privilege of practice has been granted. Manifestly, that which has a tendency to blight the character or lower the standards of the business or professional practice of these individuals would be in contravention of the public aspirations so clearly reflected in the licensing statutes. Thus we conclude that debasement of the professions is not only inimical to public welfare in fact, but is in contravention of an established and fixed community want.

It may be argued that the result of this conclusion is to penalize the opticians who make the payments which are the subject of this controversy, and to leave untouched the doctors who receive them and whose professional ethics are involved. This may be the fact. But the opticians are, as has been fully demonstrated, far from blameless. If the present contracts between the petitioners, opticians, and the doctors are void as against public policy, then payments made under these contracts, regardless by which party thereto, are not deductible as ordinary and necessary expenses. Cf. *Wolfe* v. *International Re-Insurance Corporation, supra; Reilly* v. *Beekman, supra; Easton Tractor & Equipment Co., supra; Kelley-Dempsey & Co., supra.*

We conclude that the payments under the contracts between the two optical businesses, composed of petitioners, and the oculists are not deductible as ordinary and necessary expenses because the contracts under which these payments were made violated public policy.

The final issue raises the question of the propriety of respondent's action in asserting a negligence penalty for each year against petitioner Thomas B. Lilly. This penalty was proposed, according to the deficiency notice, because of the "understatement of income."

Practically all of the asserted understatement of income arises through respondent's contention that the entire net income of the City Optical Co. should have been included as income taxable to Thomas B. Lilly instead of only 51 per cent thereof, and his disallowance as deductions of the "kick-backs" designated as "trade discounts" to doctors.

We have disapproved the action of the respondent in taxing the entire net income of the City Optical Co. to petitioner Thomas B. Lilly. The disallowance of the deduction of the "kick-backs" has been approved. However, this record demonstrates, and we have found, that the petitioner reasonably believed that the deduction was proper in computing income. There was no concealment as to the amount of the deduction. In addition to the above mentioned two items of adjustment, there were several trivial items of income omitted which are conceded by this petitioner, and a comparatively small sum resulting from an adjustment by the respondent of the amount claimed as a loss sustained in the liquida-

tion of the Duke Optical Co. That transaction was disclosed by the return and allowed in part by the respondent. The total loss claimed was, upon audit, reduced by the net book value of certain assets taken over by this petitioner upon the liquidation.

We do not think the record discloses a reasonable basis for the conclusion that the returns of petitioner Thomas B. Lilly, for the three years here in question, were made negligently or with intentional disregard of rules and regulations. *A. M. Standish*, 4 T. C. 995; *Briggs-Weaver Machinery Co.*, 14 B. T. A. 1351; *Hans Pederson*, 14 B. T. A. 1089; *Herman Senner*, 22 B. T. A. 655; *Wilson Bros. & Co.* v. *Commissioner*, 124 Fed. (2d) 606. The action of the respondent in asserting the 5 per cent negligence penalty is disapproved.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

ARUNDELL, *J.*, dissenting: I am disturbed by the holding in the majority opinion that a commission (characterized as a "kick-back") paid by an optician to a doctor for sending him customers may not be deducted as an ordinary and necessary expense on the ground that this practice of the doctors is unethical and contrary to public policy. The question seems to be one of first impression.

The revenue statutes are designed to raise money to support the Government and, as stated by Judge Sibley in *Alexandria Gravel Co.* v. *Commissioner*, 95 Fed. (2d) 615, they are none too squeamish about how the income to be taxed was realized. The profits of illegal businesses are taxed the same as the profits of legitimate businesses and, as the tax is based on net income rather than gross income, the expenses incurred in carrying on of the illegal business have been generally allowed, as the purpose of the tax laws is not to penalize a business because it is one on which the law frowns. *Commissioner* v. *Heininger*, 320 U. S. 467. It is true that courts have balked at permitting the deduction of sums paid as bribes and sums paid to perform an act specifically forbidden by law, but those holdings were based on the finding that such expenditures could not be characterized as "ordinary" or "necessary" in the carrying on of a trade or business.

Our income tax system is what is commonly called a selfassessing one and the deductions to be allowed are the ones spelled out by Congress. Expenditures incident to the earning of the income are, generally speaking, deductible in determining the income to be taxed. As I understand the holding of the majority, it is that what would be normally regarded as an ordinary and necessary expense may not be deducted in this case because the arrangements incident to the payment are said to be contrary to public policy.

There are many definitions of what is public policy, and Words and Phrases, vol. 35, pp. 274–291, contains hundreds of excerpts from court decisions defining the term and some of the definitions as quoted in the majority opinion are to be found in this work. In *Vidal* v. *Girard's Executors*, 2 How. 126, 197, where certain conditions which had been attached by a testator to a devise for the establishment of a college were challenged as being violative of the public policy of Pennsylvania, the Supreme Court held:

In considering this objection, the court are [*sic*] not at liberty to travel out of the record * * * to consider whether the scheme of education by him prescribed, is such as we ourselves should approve, or as is best adapted to accomplish the great aims and ends of education. Nor are we at liberty to look at general considerations of the supposed public interests and policy of Pennsylvania upon this subject, beyond what its constitution and laws and judicial decisions make known to us. The question, what is the public policy of a state, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions * * *. We disclaim any right to enter upon such examinations, beyond what the state constitutions, and laws, and decisions necessarily bring before us.

More recently, in *Muschany* v. *United States*, 324 U. S. 49, 66, the Supreme Court has stated:

* * * Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Vidal* v. *Philadelphia*, 2 How. 127, 197–98. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.

It would seem to me that the Tax Court should be reluctant to undertake the determination of the question of what is and what is not contrary to public policy, both for the United States and for each of the forty-eight States, where the act condemned as against public policy is not one shown to be in violation of any law of the land. What are deductible items should be known to a taxpayer with reasonable certainty under our income tax system. This Court in the past has taken the position that it does not possess the right to condemn undesirable trade practices as being against public policy where it could find no expression of statutory law or other authority to that effect. See *F. L. Bateman*, 34 B. T. A. 351.

It is interesting to note that the Commissioner, in his regulations, does not point out that expenditures of this sort fall *without* the purview of the statute, and in his brief in this case he does not argue that the agreements between petitioner and the doctors were contrary to public policy, but, rather, that the payments to the doctors are not ordinary and necessary expenses in that they were voluntary and incident to an unethical practice.